## STATE v. LAUB et al.

No. 6480.   Decided December 7, 1942.   (131 P. 2d 805.)

See 23 C. J. S., Criminal Law, sec. 907; What amounts to asportation which will support charge of larceny, see note in 19 A. L. R., 727; see also 32 Am. Jur., 906.

*N. E. Callister*, of Los Angeles, Cal., and *John M. Foster*, of Cedar City, for appellants.

*Ellis J. Pickett*, of St. George, *Grover A. Giles*, Atty. Gen., and *Calvin L. Rampton*, Deputy Atty. Gen., for respondent.

WOLFE, Justice.

The defendants, Oliver Leland Laub, Fred A. Reber, James Alden Pectol, and Rex Cannon, in a trial before the court without a jury, were convicted of the crime of grand larceny and they appeal. The only assignment of error seriously urged is that the evidence is insufficient to sustain the convictions. Since the evidence is entirely circumstantial and consists of separate events testified to by separate witnesses, it is necessary to state the evidence in full.

The uncontradicted evidence showed that on or about October 9, 1941, someone feloniously killed a calf belonging to Charles Foster and stole the meat. To prove this, the State called Marion Terry, a local rancher. He testified that on October 12, 1941, while he was riding with Charles Foster and two other persons in the vicinity of Round-Up Flat, he came upon a burlap sack containing calf entrails lying in some oak brush. Terry's testimony indicated that he was familiar with the differences between deer and calf entrails and he testified that he was positive that this burlap sack contained calf entrails. A short distance from the place where the entrails were found, these same men came upon a herd of cattle. In the herd was a cow belonging to Charles Foster. The cow had a tight bag, indicating, according to the testimony of Terry, that she had been without her calf for three or four days. The cow was taken to a corral and turned loose to hunt her calf. She returned immediately to a place near where the entrails were found and remained there. Both Foster and Terry testified that the entrails had been removed from the calf for about three or four days.

Terry returned to this spot the next day, October 13, with Sheriff Prince and Joseph A. Terry. They, after a search, found another burlap sack containing the head, legs, and hide of a calf, which calf was estimated by Terry to have been about six months old when it was killed. There was no brand on the hide but an eight inch hole had been cut out of the side over the ribs where witness, Charles Foster, testified that he usually branded his cattle. The hide was marked with a dewlap, i. e., a strip of hide cut loose from the brisket for identification purposes. The testimony was that Foster was the only man in that vicinity who marked cattle with a dewlap. Foster also testified that he recognized certain natural markings on the hide and that he was certain that this hide came from his calf. The hide was not stiff and had not started to decompose as would have been the case, according to the testimony, if the hide had been more than three or four days old.

The chain of events which tends to connect these defendants with the felonious killing of this calf belonging to Charles Foster had its beginning on October 9, 1941, in the vicinity of Round-Up Flat. The State called one Jacob T. Truman who testified that he was driving a truck through Round-Up Flat in the afternoon of October 9. He, with his son, was headed for Pine Park, some three miles beyond Round-Up Flat, to get a load of wood. They noticed a truck standing near a fork in the road on Round-Up Flat. Defendant Cannon was standing beside the truck. They stopped to talk with Cannon and while so stopped they noticed the other three defendants, Reber, Pectol, and Laub, walking toward the truck from some nearby cedar trees. Truman testified that Laub had a gun which appeared to be of heavier calibre than a .22 rifle; that all three defendants had blood on their hands; and that Pectol had blood on his trousers. Truman asked if one of them had been shot or hurt and someone answered that they had killed some rabbits. A few moments later Truman, accompanied by his son and defendant Cannon, left to get the load of wood. Truman further testified that he returned to the defendant's camp on Round-Up Flat about sun down, left Cannon with the other defendants, and left for home.

Truman's son, the next witness for the State, testified that he could hear the three defendants coming through the cedar trees before he could see them, that when these three saw that Cannon had visitors, they hesitated and one of them said, "It is just Jake Truman," and they then came up to the camp. The son further testified that after they had gotten their load of wood from Pine Park they returned to the defendants' camp and stopped for a few minutes. At that time, Laub said, "As soon as Jake leaves I am going to have some buck liver." In all other respects his testimony was similar to that of his father.

The next incident occurred at 9 p. m. the same night at the ranch of Marion Terry, about eight miles east of Round-Up Flat. The defendants stopped at this ranch and Laub

entered the ranch house. Terry testified that he noticed some blood on Laub's trousers and asked about it. Laub told him that the blood had come from a four point buck which they had killed, cut up, and rolled in some bedding on the truck. Laub told Terry that Reber, Pectol, and Cannon were with him and stated that they had to get going so they could get ahead of Truman whom they were afraid would say something in town which might incriminate them.

In further evidence of their haste to get home ahead of Truman, the defendants testified that although it was after sun down and they had not eaten since early morning, they left for home soon after Truman departed. They had part of their grub unloaded from the truck, had a fire built and coffee made. They drank a cup of coffee but did not stop to eat; however, they did testify that they had been drinking wine and it may be that they did not feel like eating at that time.

On October 14, 1941, the next day after Sheriff Prince found the hide, legs, and head of the calf, he procured some search and seizure warrants and searched the home of defendant Laub. He there found a veal or beef roast and ten bottles of meat which Laub admitted had been bottled since his return from Round-Up Flat on October 9th. The other three defendants testified that they had some beef on their truck when they returned from Round-Up Flat, each admitted that he had taken part of this meat, and that he had some of this fresh beef at the time Laub's home was searched.

In defense, the defendants each testified that they had been on a six-day trip searching for pinenuts. On part of this trip they were in Nevada. While there, defendant Pectol traded 70 pounds of pinenuts for 100 pounds of beef and the defendants testified that it was this beef which was found in Laub's home and which they had on their truck when they left Round-Up Flat. They denied that they shot a calf beloning to Charles Foster or to anyone else, denied that they had blood all over their hands when the Trumans

saw them but stated they might have had a few drops of blood on them for they had killed and dressed two rabbits a short time before meeting the Trumans. They also denied that they told anyone they had shot a deer, or that they were trying to get ahead of Truman. This is substantially all of the evidence.

Defendants in their brief contend that in order to constitute the crime of grand larceny, where the value of the meat does not exceed $50, the calf must be shown to have been alive during the entire course of the commission of the crime. This contention would appear correct if the person who took the carcass had had nothing to do with the killing of the animal. But where the animal is killed as a means of making the theft possible, the crime of grand larceny is complete just as much as if it had been loaded on a truck alive and taken away. This was a six month old calf. It was on the open range. If the person seeking to steal it shot it in order to catch it, the crime of grand larceny would be made out at the time it was shot and taken into possession. The killing or shooting was but the manner chosen to obtain possession. See *State* v. *Crossman*, 189 Wash. 124, 63 P. 2d 934; *McIntosh* v. *State*, 105 Neb. 328, 180 N. W. 573, 12 A. L. R. 798.

While the State's evidence is circumstantial, such evidence may be just as conclusive or even more so than direct evidence, but the prosecution still has the burden of proving beyond a reasonable doubt that the defendant is guilty. Or stated another way, the prosecution must

"not only show by a preponderance of evidence that an offense was committed, and that the alleged facts and circumstances are true, but they must also be such facts and circumstances as are incompatible, upon any reasonable hypothesis, with the innocence of the accused, and incapable of explanation upon any reasonable hypothesis other than the defendant's guilt." *People* v. *Scott*, 10 Utah 217, 37 P. 335. See also *State* v. *Burch*, 100 Utah 414, 115 P. 2d 911; *State* v. *Crawford*, 59 Utah 39, 201 P. 1030.

As pointed out in Underhill's Criminal Evidence, Fourth Edition, page 21,

"All the circumstances as proved must be consistent with each other, and they are to be taken together as proved. Being consistent with each other and taken together, they must point surely and unerringly in the direction of guilt. * * *"

Hence, if two reasonable hypotheses are pointed out by the evidence and one of them points to the defendants' innocence, it would then be difficult to see how any jury could be convinced beyond a reasonable doubt of the defendants' guilt.

Viewed in the light of this principle, we need only determine whether or not the evidence is sufficient to convince the trial court beyond a reasonable doubt that the defendants committed this crime, i. e., whether it is reasonable to hold that this evidence is inconsistent with their innocence. We briefly analyze and piece together the evidence so that each piece may throw proper illumination on each other piece.

The evidence set out above almost conclusively shows that someone killed a calf belonging to Charles Foster and took the carcass. The attempt made to destroy marks of identification on the hide and remains of the calf is inconsistent with any hypothesis except that the person disposing of the hide, etc. had a guilty mind and was trying to conceal his crime. This calf was killed in the vicinity of Round-Up Flat on or about October 9, 1941.

What evidence is there that the defendants or some of them jointly committed the theft? First as to Reber, Pectol and Laub: They were all together with Cannon in Round-Up Flat at or near the time of the commission of the crime. They had in their truck several burlap sacks—sacks similar to those in which the remains of the calf were found. Their conduct when they first saw the Trumans was one of hesitancy, showing surprise and reluctance to be discovered. They had fresh blood in quantity upon their hands and

clothes. Laub carried a rifle. One or more of them consciously attempted to draw the minds of the Trumans away from any inference that it might have been beef blood by explaining that it was rabbit blood. Yet Laub in front of the Trumans and in the presence of the other defendants later made, when considered in the light of the actual fact that a very short time thereafter they had the carcass of a beef on the truck, a positive and conscious effort to impress upon the Trumans that they had been handling a deer. Later all four defendants left Round-Up Flat in the truck for Terry's ranch. Their own admissions made at the trial show that they had the carcass of a beef on the truck at that time. Laub, however, falsely told Terry that it was the carcass of a deer. He also stated that they were anxious to get ahead of the Trumans, "before Jake has a chance to say anything." While these statements were made out of the presence of the other defendants and cannot, therefore, serve to show a guilty mind on the part of anyone except Laub, they are competent as to him for that purpose. In addition, Laub told the jury that the blood which they had on their hands at the time they met the Trumans was rabbit blood, thus conflicting with the impression he sought to induce in the minds of the Trumans and Terry that it was deer blood. There is, therefore, certainly sufficient evidence to connect Laub with the crime as a perpetrator or one of the perpetrators thereof.

How stands it as to Reber, Pectol and Cannon? As to the former two, we think there is sufficient circumstantial evidence to connect them with the corpus delicti as joint perpetrators thereof with Laub. Their conduct at the time all three approached the Trumans and the statements to the Trumans are equally as efficacious as to them as they were to Laub. While the effect of Laub's statements to Terry cannot be used against them the other evidence is sufficient to connect them with the crime. Besides their conduct while approaching the Trumans and statements made in their presence, there is evidence that they all had

joint possession of the carcass on the truck which they admitted at the trial was that of a beef and not a deer. In view of their conduct before the Trumans and the blood on their persons it is inferable that they all had a joint or a common possession of that carcass before it was on the truck. This fact, viewed in the light of their conflicting statements as to what animal they had been handling, together with the fact that the entrails of the calf which had been freshly killed were found in fairly close proximity to their camp and in a burlap bag of the same type as they had on the truck, laid a reasonable basis for the jury to conclude that the beef which they had on the truck and part of which each had at his home came from Foster's calf and not, as they said, from a trade in Nevada for pinenuts.

The defendants contend that all of this evidence was directly controverted by them at the trial. They denied they hesitated when they saw the Trumans. Laub denied that he told anyone that he had killed a deer or that he ever said anything about deer liver. But the trial court had the witnesses before it and was convinced that the witnesses called by the State were telling the truth. It is not our province on appeal to judge the credibility of witnesses when their testimony is in direct conflict. We are concerned only with the question of the sufficiency of the evidence to sustain the convictions by showing that the jury could have found beyond a reasonable doubt that the defendants were guilty. *State* v. *Aures,* 102 Utah 113, 127 P. 2d 872. We are convinced that the evidence in this case is sufficient in so far as Laub, Pectol, and Reber are concerned.

Cannon, however, is in a different position. He was not with the other three defendants when they came from the woods. He did not have any blood on him, nor did he stay with the other defendants so that the court or jury could infer that he helped bring the carcass to the truck. The uncontradcited evidence is that he went with the Trumans to help them load their wood and did not

rejoin the other defendants until they were ready to leave for home. The only evidence which points to his guilt is that he made false statements about trading pinenuts for the meat in Nevada and he took part of the meat. This is not sufficient evidence to uphold his conviction. This is not a charge of conspiracy and there is no evidence that he in any way aided in or planned the commission of the crime. The conviction of Cannon is not sustained by the evidence and must be reversed. Laub, Pectol, and Reber were properly convicted and their conviction is hereby sustained.

MOFFAT, C. J., and LARSON and McDONOUGH, JJ., concur.

PRATT, J., on leave of absence.