355 P.2d 57

STATE of Utah, Plaintiff and Respondent,

v.

Jesse M. GARCIA, Jr., Defendant and
Appellant.

No. 9092.

Supreme Court of Utah.

Sept. 8, 1960.

Hansen & Miller, Salt Lake City, for appellant.

Walter L. Budge, Atty. Gen., Vernon B. Romney, Asst. Atty. Gen., for respondent.

WADE, Justice.

Defendant, Garcia, appeals from a judgment on a jury verdict finding him guilty of murder in the first degree without recommendation of leniency. Garcia and Mack Rivenburgh and Leonard Bowne were charged in separate actions with murdering LeRoy Verner on August 24, 1958. The killing occurred at the Utah State Prison where the deceased and the alleged killers were inmates.

Garcia claims that he understood that he and Bowne were acting as lookouts for Rivenburgh and deceased while engaged in homosexual relations, and although there is evidence that he gave Rivenburgh a knife, and that he took some part in the struggle resulting in the killing, and he had previously heard Rivenburgh state that he would kill Verner, he claims that he was so drugged with dope that he had no idea that the killing was planned, nor did he have the capacity to deliberately plan the killing until after it had occurred. He further claimed that the use of drugs, possession of knives and other deadly instruments, and sodomy between inmates and threats to kill were all so common at the prison during that time that he, a boy of 16, could hardly be guilty of a deliberate and premeditated killing.

Before opening court at about 9:00 a. m. on the morning after all the evidence was in, but before the jury were instructed or the case argued or submitted to the jury, the judge called counsel to his chambers and stated:

"This morning about 8:30, a juror by the name of Armstrong asked me, as

I arrived at the courthouse, if he could ask me a question, and I told him 'yes.' He came in the chambers, and he asked if the parties were going to introduce the tapes of a conversation between the two defendants. I told him I did not know. I would tell counsel that he had asked and leave it up to counsel. He also said that he was anxious to know, it was important, because he could not get an answer to a question in his mind as to who did the stabbing. He said there was evidence that Garcia had the knife in the attic in his hand, and that later on, another person had the knife, and he did not know who did the stabbing. I told him that I would relate his questions to counsel, and leave it up to counsel to either attempt to reopen their case and put in more evidence to clarify or take care of the matter on argument."

Counsel contends that this shows prejudicial error which requires a reversal.

■■■ In a criminal action before submission to the jury it is discretionary with the trial judge to allow the jury to separate or keep them in charge of an officer who must be sworn to suffer no person to speak to or communicate with them, nor to do so himself on any subject connected with the trial.[1] Also on adjournment the jury must be admonished not to converse among themselves nor with anyone else on any subject connected with the trial.[2]

■■■ While in a sense the juror's conversation with the trial judge was on a subject connected with the trial, this was not the kind of a communication banned by the above statutes. The trial judge was the natural and proper person to consult on the question bothering the juror. Although it would be improper for the trial judge when thus approached by a juror to discuss with the juror the problem which he presented, in this case the judge acted properly and did not attempt to solve the juror's problems, but merely told him he would ask counsel about it. After counsel had been informed, neither party changed its position nor introduced additional evidence; nor did either party object to what the court had done in listening to these questions. There is nothing about this situation which would tend to prejudice the defendant. The cases cited by the defendant are not in point on this question.[3] The juror's conversation with the judge was

---

1. See Sec. 77–31–27, U.C.A.1953.
2. See Sec. 77–31–28, U.C.A.1953.
3. See State v. Crank, 105 Utah 332, 142 P.2d 178, 170 A.L.R. 542; State v. Anderson, 65 Utah 415, 237 P. 941; State v. Thorne, 39 Utah 208, 117 P. 58, where the juror probably discussed the case with outside interested parties, and Johnson v. Maynard, 9 Utah 2d 268, 342 P. 2d 884, where trial judge entered the jury room to answer questions of the jury without notifying counsel.

not a part of the trial,[4] nor did the trial court receive from the juror an improper question as claimed by the defendant.[5]

Defendant next argues that he was entitled to a directed verdict or dismissal of the action. He urges that if the evidence indicates a reasonable hypothesis or explanation of the facts as shown by the evidence consistent with his innocence, the State has failed to make a case to be submitted to the jury. It is universally recognized that there is no jury question without substantial evidence indicating defendant's guilt beyond a reasonable doubt. This requires evidence from which the jury could reasonably find defendant guilty of all material issues of fact beyond a reasonable doubt.[6] In applying this rule, usually with reference to the jury instructions, we have held that where the only proof of material fact or one which is a necessary element of defendant's guilt consists of circumstantial evidence, such circumstances must reasonably preclude every reasonable hypothesis of defendant's innocence.[7] An instruction to this effect in an appropriate situation would be proper but this requires care to use language which the jury would understand and which would not merely lend to their confusion.[8]

We must keep in mind that this rule is applicable only where the proof of a material issue is based solely on circumstantial evidence.[9] Here there was direct proof on every material issue of fact. On the main issue urged by defendant under this argument, of whether defendant knew the killing was planned beforehand, defendant expressly admitted in a statement made before the trial that Rivenburgh had told him before the encounter which resulted in the killing of his intention to kill Verner. This statement was direct proof of defendant's intentional participation in the acts resulting in the killing. So this rule has no application to the facts in this case.

Also, there is a great difference between what a jury might find to be a reasonable hypothesis of innocence and the necessary evidence to require the court to hold as a matter of law that such reasonable hypothesis of innocence had been shown. Only where the evidence is so conclusive that

4. See State v. Aikers, 87 Utah 507, 51 P.2d 1052.
5. See State v. Martinez, 7 Utah 2d 387, 326 P.2d 102; State v. Anderson cited in footnote 3.
6. See State v. Erwin, 1941, 101 Utah 365, at page 400, 120 P.2d 285, at page 302.
7. See State v. Erwin, supra; State v. Burch, 1941, 100 Utah 414, 115 P.2d 911;

State v. Laub, 1942, 102 Utah 402, 131 P.2d 805; State v. Anderson, 1945, 108 Utah 130, 158 P.2d 127, 159 A.L.R. 340; State v. Crawford, 1921, 59 Utah 39, 201 P. 1030; People v. Scott, 1894, 10 Utah 217, 37 P. 335.
8. See cases cited in footnote 7.
9. See cases cited in footnote 7.

a reasonable hypothesis of innocence has been proved that a contrary holding would be beyond the bounds of reason is the court authorized to direct a verdict in defendant's favor under this doctrine. The evidence in this case clearly does not meet these requirements.

Defendant assigned as error the failure of the court to make it clear by Instruction No. 20 that defendant would be guilty of murder only if he kept watch for Rivenburgh or otherwise aided and abetted him in the killing of the deceased, knowing that he planned the killing and not merely planned or intended to commit sodomy with deceased. To show that such was the effect of that instruction he quotes from that instruction the following paragraph:

"You are instructed that one who keeps watch where a crime is being perpetrated, so as to facilitate the escape of one actually committing it, or to prevent his being interrupted, if the said keeping watch is pursuant to a common design to commit the crime, said person keeping watch, is aiding and abetting, and is a principal."

This quotation alone seems to lend support to defendant's contention. For the evidence was replete with reference to defendant's keeping watch for Rivenburgh while he committed sodomy with the deceased. However, a careful study of the entire instruction shows that this contention is groundless. The instruction repeatedly limited the aiding and abetting by the defendant to knowingly and intentionally keeping watch or otherwise participating in the commission of the crime charged. The crime charged was murder in the first degree. Also, the instruction many times expressly stated that defendant would be guilty of murder by aiding and abetting in the killing only if he knew of the intention to kill or otherwise knowingly participated in the killing. In view of these express statements of the required elements of aiding and abetting in this murder which are contained in this instruction, the court did not err in this respect.

One other contention requires consideration. Defendant contends that the court erroneously failed to require the State to furnish the defense with copies of tape recordings and statements of defendant and other witnesses obtained by the State during the investigation of the facts of this killing. Defendant claims prejudice because the State was thereby afforded the opportunity of quoting such statements out of context. Defendant, however, fails to point out specific instances where the State did quote from these statements out of context.

The record is very incomplete as to what was furnished defendant in this regard. We find the demand by the defendant that he be furnished with this material, but the record contains no order of the court on this question. However, the State claims,

and defendant does not deny, that only copies of the tape recordings were not furnished the defendant, but that copies of all other such material were furnished to him. The State further claims that the recordings were made available to the defense for inspection, and that defense counsel actually listened to the playing of such recordings. Since there was no denial we assume that these claims by the State are correct.

A few days after the killing Garcia and Bowne were brought into the warden's office for questioning by Mr. Banks, then Assistant County Attorney, in the presence of Lt. Robinson of the Salt Lake City Police force and others who were investigating the killing. At their request Garcia and Bowne were allowed to talk together privately and a tape recording was made of this private conversation, but the record does not indicate that this was important. Later, the investigators returned to the warden's office, where, under the questioning of Banks, Garcia and Bowne each made statements which were tape recorded. Thereafter, they all went to another place in the prison where again under the questioning of Banks they practically repeated the previous statements which had been tape recorded. These last statements were transcribed by a stenographer and Garcia and Bowne, after reading and making corrections, each initialed each page thereof and signed his name at the end.

In this signed statement both Garcia and Bowne admitted that Rivenburgh had told them of his plan to kill Verner before the killing and had used them as lookouts to prevent interference. The tape recording contains similar statements, and Garcia admitted that he went to another inmate at Rivenburgh's request and obtained a knife which had been previously prepared by Rivenburgh, and that he returned the knife to Rivenburgh. The statements by Garcia and Bowne in the tape recording are very similar to the written statements signed by them.

The State introduced the material parts of the signed statement in evidence by Banks reading the questions which he asked and Lt. Robinson reading the answers given by Garcia and Bowne. In his defense Garcia tried to refute this statement by testifying that he never heard of Rivenburgh's plan to kill Verner until after the killing. However, he still admitted that he procured the knife which was used in the killing from another inmate and gave it to Rivenburgh. To impeach Garcia, on cross-examination he was confronted with his tape-recorded statement, which he denied in part, refused to answer on the grounds of the Fifth Amendment in part, and always claimed that he did not believe that Rivenburgh seriously intended to kill the deceased until after the killing was all over. In view of the great similarity between the signed statements and the tape

recording, and the fact that Garcia knew of the statement which was recorded, and his counsel heard the recording played on a record before the trial, it is inconceivable that the failure of the State to furnish the defense with a transcribed copy of this recording was prejudicial to his case.

There are other grounds urged by defense for reversal, which we have carefully considered, but find them to be without merit. Judgment of conviction is affirmed.

CROCKETT, C. J., and HENRIOD, McDONOUGH and CALLISTER, JJ., concur.