**2022 UT 9**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Petitioner*,

*v.*

ANTHONY SOTO,
*Respondent*.

No. 20180810
Heard May 6, 2019
Supplemental Briefing Concluded June 18, 2019
Filed February __, 2022

On Certiorari to the Utah Court of Appeals

Third District, Salt Lake
The Honorable Mark S. Kouris
No. 151902137

Attorneys:

Sean D. Reyes, Att'y Gen., Lindsey Wheeler, Asst. Att'y Gen.,
Salt Lake City, for petitioner

Andrea J. Garland, Lisa J. Remal, Richard Sorenson, Salt Lake City,
for respondent

JUSTICE HIMONAS authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT and JUSTICE PEARCE joined.

JUSTICE PETERSEN filed a dissenting opinion, in which ASSOCIATE
CHIEF JUSTICE LEE joined.

JUSTICE HIMONAS, opinion of the Court:

### INTRODUCTION

¶1 Two court personnel—a uniformed highway patrolman assigned to protect the Supreme Court and a court IT technician—shared a nonpublic courthouse elevator with a jury during trial and told them, in so many words, to find the defendant, Anthony Soto, guilty, and, according to at least one juror, to "hang him." All

the while, the trial court bailiff stood quietly in the elevator, arguably condoning these statements through his silence.

¶2   We granted certiorari to determine if the court of appeals correctly held that such conduct triggers a rebuttable presumption of prejudice against Soto. Based on the Utah Constitution and long-standing precedent, we conclude that the court of appeals was correct.

¶3   Article I, section 12 of the Utah Constitution guarantees every criminal defendant the right to "trial by an impartial jury." The Sixth Amendment to the United States Constitution guarantees the same. So fundamental is this right to our system of criminal justice that courts across the country hail it as "sacrosanct," *Harper v. Barge Air Conditioning, Inc.*, 722 S.E.2d 84, 88 (Ga. Ct. App. 2011), and one of "[t]he most fundamental principles of American criminal law," *State v. Coy*, 550 S.W.2d 940, 942 (Mo. Ct. App. 1977).

¶4   For almost a hundred years, this court has recognized that essential to the guarantee of an "impartial jury" is keeping the jury insulated from outside contacts that may influence their decision. When "the personal liberty" of a person is at stake, "the law requires of the juror such conduct during that time that his verdict may be above suspicion as to its having been influenced by any conduct on his part during the trial." *State v. Anderson*, 237 P. 941, 944 (Utah 1925). So, when an unauthorized contact likely to influence the jury occurs, the defendant is entitled to a rebuttable presumption that the contact has prejudiced him or her. *See State v. Pike*, 712 P.2d 277, 280 (Utah 1985).

¶5   The regretful contact in this case violated Soto's right to an impartial jury and triggered a rebuttable presumption that Soto was prejudiced by that constitutional assault. Our precedents dictate that to rebut this presumption, the State must show the contact was harmless beyond a reasonable doubt. We remand the case to the district court to determine whether the State has met this burden.

## BACKGROUND

¶6 Anthony Soto was arrested and charged with sexual assault. During a lunch break on the second day of his trial, the bailiff escorted the jurors to a nonpublic, court-employee elevator.

According to the jurors,[1] a uniformed highway patrolman was present in the elevator and said something to the jury along the lines of: "Let me tell you how this ends" or, potentially, "[j]ust say he's guilty." The bailiff said nothing. The elevator descended two floors, and a court IT technician joined the jury inside. The technician said something to the effect of, "you guys look like a jury," to which a juror replied with words akin to, "[d]o we look that obvious?" The technician responded with something in the vein of "[c]an you say guilty?" The bailiff again said nothing in response to these ill-chosen comments. He did, however, report the incident to the trial judge.

¶7 Upon learning of the patrolman's and technician's comments, the trial court promptly intervened. The court interviewed each juror separately with the parties present and asked each juror questions such as: "Did you hear any of those comments," "what did you hear," and "will that comment have any effect at all with how you see this case?" The replies from each juror about what they heard varied and included the following: "Just say he's guilty," "let me tell you how this ends," "[y]ou can already tell he's guilty," and, most disturbing of all, "convict him or hang him." All jurors agreed on the overall sequence of events, and all but one said that at least either the patrolman or the technician had commented on Soto's guilt and the trial's outcome. The remaining juror could not remember what either man had said. No juror said they believed the comments would impact their impartiality or ability to render a verdict.

¶8 Defense counsel moved for a mistrial because the jurors "almost all sa[id] they heard the word guilty," and "the gist of that comment was that they should find the defendant guilty or he must look guilty." Defense counsel further argued that the jurors' subjective avowals that their impartiality remained intact were not reliable because "we're all influenced by things and don't even realize it sometimes."

---

[1] When interviewed by the trial court about the interactions in the elevator, the jurors gave somewhat conflicting responses. While there is no doubt that the patrolman and the technician spoke with the jurors, and the general topic of the comments related to Soto's guilt, it is unclear *exactly* what was said. *See infra* ¶¶ 73–75, 74 n.14. We have tried to present the factual background as clearly as possible considering the record.

¶9   The trial court denied defense counsel's motion for a mistrial and gave a curative instruction to the jury. The judge informed the jurors that the patrolman was tasked with guarding the Utah Supreme Court Justices and that he had no connection to Soto's trial and "really no connection to the court system at all." The judge elaborated: "He's not a bailiff, he's nothing like that. He drives his police car, parks downstairs where we park and he goes up to guard [the Supreme Court]. So he would have absolutely no knowledge of any part of this trial." Additionally, the judge explained that the technician's job was to fix broken equipment and that "we know what IT guys know about trials and that's pretty much nothing." The judge concluded by telling the jury, "I don't want you to think that those folks have any inside information or any talk or gossip or anything about what's going on. They know absolutely nothing about this case and every comment they made was completely off the cuff, they were trying to be funny. Quite frankly, they weren't."

¶10 The trial proceeded, and the jury found Soto guilty. Soto appealed.

¶11 On appeal, Soto argued that he was denied his constitutional right to a fair and impartial jury because of the improper juror contact.[2] The court of appeals agreed. It held that the contacts between the jury, the patrolman, and the technician triggered a rebuttable presumption of prejudice, which the State had not rebutted. *State v. Soto*, 2018 UT App 147, ¶ 23, 427 P.3d 1286. The court of appeals reversed Soto's conviction and remanded for a new trial. *Id.* ¶ 24. The State filed a writ of certiorari with this court, which we granted.

¶12 We exercise jurisdiction under Utah Code section 78A-3-102(3)(a).

**STANDARD OF REVIEW**

¶13 On certiorari, "we review the decision of the court of appeals and not that of the [trial] court." *State v. Hansen*, 2002 UT 125, ¶ 25, 63 P.3d 650 (citation omitted). And "we review the

---

[2] Soto also argued that there was insufficient evidence to support his conviction, but, because the court of appeals did not rule on this issue, we do not address it here. *See State v. Soto*, 2018 UT App 147, ¶ 8 n.1, 427 P.3d 1286.

decision of the court of appeals for correctness." *Id.* (citation omitted). As for the content of the court of appeals' decision, "[i]nterpretation of the Utah Constitution" is a "question[] of law that we review for correctness." *Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, ¶ 37, 250 P.3d 465.

## ANALYSIS

¶14 The Utah Constitution guarantees a defendant the right to "trial by an impartial jury." UTAH CONST. art. I, § 12. Under our case law, that right prohibits improper contacts between juries and third parties during trial.[3] *See State v. Anderson*, 237 P. 941, 942–44 (Utah 1925); *State v. Pike*, 712 P.2d 277, 279–80 (Utah 1985). The United States Constitution provides the same protection. *See* U.S. CONST. amend. VI.

¶15 A long line of Utah cases dating back to statehood recognizes that improper contacts between juries and third parties may trigger a rebuttable presumption of prejudice, depending on *who* made the improper contact, *what* was said, and the *circumstances* of the contact. When the third party is a person of importance in the proceedings or authority within the criminal justice system, we are more likely to presume prejudice. We are also more likely to presume prejudice when the content of the communication involves a subject of the trial. Finally, we consider all relevant circumstances that may favor or disfavor a presumption of prejudice.

¶16 Applying this balancing test and our precedents to this case, we hold that the contacts here triggered a rebuttable presumption of prejudice. Soto's jury had contact with a

---

[3] Our rules of procedure also place broad prohibitions on juror contacts with third parties. *See* UTAH R. CIV. P. 47(*l*), (m); UTAH R. CRIM. P. 17(*l*). Obviously, these rules can only add to and never diminish or supplant our constitutional requirements of a criminal defendant's right to trial "by an impartial jury." UTAH CONST. art. I, § 12; U.S. CONST. amend. VI. Nor do these rules tell us of the appropriate remedy for their violation. As we demonstrate herein, the constitutional right and the remedy for its violation are two sides of the same coin—when a constitutionally questionable juror contact occurs, the defendant is entitled to a rebuttable presumption of prejudice, subject to the long-standing standard for addressing constitutional deprivations.

uniformed highway patrolman assigned to protect the Supreme Court, who was literally clothed in the authority of the state, and a court IT technician. Those individuals made statements to the jurors aimed at the heart of the most essential element of a criminal trial—the defendant's innocence or guilt. And the bailiff, understood by the jury as their protector from undue outside influences, heard it all but remained silent, potentially validating the comments in the minds of the jury.

¶17 Once the rebuttable presumption of prejudice is triggered, it is up to the State to rebut it. Although we have said that the State bears a heavy burden to rebut the presumption, we have not always cleanly articulated the standard. Today, we hold that the State can carry its burden only by proving harmlessness beyond a reasonable doubt, the standard formulation for a constitutional deprivation. We then discuss how the State might go about doing so. We accordingly remand to the district court to determine whether the State has proved beyond a reasonable doubt that the improper contacts were harmless.

## I. THE RIGHT TO AN IMPARTIAL JURY: ITS SCOPE AND THE REMEDY FOR ITS VIOLATION

¶18 The constitutional right to trial "by an impartial jury" requires maintaining the sanctity of the jury process throughout the trial. In this part, we first explain the scope of this right and how it prohibits undue outside influence on the jury at any point between the jury's empanelment[4] and the rendering of judgment. We then explain that the remedy for unauthorized communications likely to influence the jury's judgment—like those that took place here—is a rebuttable presumption that the defendant has been prejudiced.

*A.  The Jury Must Not Be Tainted by Undue Outside Influences*

¶19  Article I, section 12 of the Utah Constitution and the Sixth Amendment to the United States Constitution both guarantee a criminal defendant the right to trial "by an impartial jury." Today, we focus on outside contacts with the jury after its empanelment.

---

[4] A jury is said to have been "empaneled" upon having been sworn in "to try an issue or case." *Empanel*, BLACK'S LAW DICTIONARY (11th ed. 2019).

¶20 At the threshold, we explain the relative roles of our state and federal constitutions in our analysis. While some of our past cases on improper jury contacts have included discussion of the Sixth Amendment, *see, e.g.*, *State v. Pike*, 712 P.2d 277, 279 (Utah 1985), most of our cases focus on the Utah Constitution. We see that as a prudent practice for two reasons. First, our State protected defendants from prejudicial jury contacts with others long before the incorporation of the Sixth Amendment against the states. *See State v. Anderson*, 237 P. 941, 942–44 (Utah 1925); *State v. Thorne*, 117 P. 58, 67 (Utah 1911). Second, "even when the text of our constitution is identical to its federal counterpart, 'we do not presume that federal court interpretations of federal constitutional provisions control the meaning of identical provisions in the Utah Constitution.'" *S. Salt Lake City v. Maese*, 2019 UT 58, ¶ 27, 450 P.3d 1092 (citation omitted). Indeed, this court has "not hesitated to interpret the provisions of the Utah Constitution to provide more expansive protections than similar federal provisions." *State v. Briggs*, 2008 UT 83, ¶ 24, 199 P.3d 935.

¶21 Still, the Sixth Amendment right to an impartial jury was incorporated against the states through the Fourteenth Amendment in *Parker v. Gladden*, 385 U.S. 363, 364 (1966) (per curiam). As such, the Sixth Amendment forms the "floor" below which the Utah Constitution's protections cannot fall. *Briggs*, 2008 UT 83, ¶ 26. And Sixth Amendment jurisprudence helps inform our understanding of the original public meaning of the right to an impartial jury. Thus, while we cite mostly to Utah jurisprudence interpreting the Utah Constitution throughout this opinion, we also consider the scope of the Sixth Amendment regarding improper jury contacts.

¶22 When "interpreting the Utah Constitution, prior case law guides us to analyze its text, historical evidence of the state of the law when it was drafted, and Utah's particular traditions at the time of drafting." *Am. Bush v. City of S. Salt Lake*, 2006 UT 40, ¶ 12, 140 P.3d 1235. "There is no magic formula for this analysis—different sources will be more or less persuasive depending on the constitutional question and the content of those sources." *Maese*, 2019 UT 58, ¶ 19.

¶23 The Utah Constitution "guarantees to every one accused of a public offense a trial by an impartial jury." *Anderson*, 237 P. at 942 (citing UTAH CONST. art. I, § 12). Our constitution is silent as to the scope of this right, and the constitutional convention debates include no information to further our inquiry, as the delegates never discussed the contours of the right to an impartial jury while

addressing article I, section 12. *See* 1 OFFICIAL REPORT OF THE PROCEEDINGS AND DEBATES OF THE CONVENTION 306–12 (1898).

¶24 But our prior case law, from the early days of statehood, establishes the importance of shielding jurors from outside influences:

> [L]ong experience has demonstrated the necessity of preventing the jury from mingling or conversing with the people, and of keeping them secluded from all outside influences calculated to interfere with or affect their impartiality or judgment. These safeguards were at common law deemed essential to the right itself of trial by jury. That right with its ancient safeguards has been preserved in this country by Constitutions and statutes.

*Thorne*, 117 P. at 67. Granted, *Thorne* was a capital case involving a jury contact that occurred during deliberations. *Id.* at 62, 66. Nevertheless, our subsequent case law and the entirety of this opinion demonstrate how the core principle articulated in *Thorne*—the need to shield the jury from outside influences likely to affect their judgment—applies more broadly to all criminal cases where a jury must decide "the personal liberty of individuals charged with offenses." *Anderson*, 237 P. at 944.

¶25 To protect this paramount right to an untainted jury, this court also has long recognized that improper influences on a jury need not be intentional or even perceived by the jury. Certain outside communications are so apt to "consciously or unconsciously . . . influence the judgment of the juror" as to likely violate the guarantee of an impartial jury. *See id.* at 943; *State v. Crank*, 142 P.2d 178, 194 (Utah 1943); *see also Pike*, 712 P.2d at 280 ("[I]mproper contacts may influence a juror in ways he or she may not even be able to recognize . . . .").

¶26 Our view of improper jury contacts under the Utah Constitution aligns with federal jurisprudence interpreting the Sixth Amendment to the United States Constitution. These decisions—many of them contemporary to the ratification of our constitution—also inform our understanding of the original public meaning of the right to an impartial jury.

¶27 The United States Supreme Court sees the Sixth Amendment right to an impartial jury as protecting against improper contacts between juries and others. The Court has explained that the Sixth Amendment guarantees that "the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial

protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Parker*, 385 U.S. at 364 (citation omitted). Accordingly, the Court has prohibited "private talk" with the jury and "outside influence" on it. *See id.* at 364–66 (citation omitted).

¶28 In *Mattox v. United States*, 146 U.S. 140 (1892), the Court talked about the protection from outside influences in common-law terms but did not reject a constitutional protection. *Mattox* also explained that past opinions treated improper contacts between jurors and third parties as "an irregular invasion of the right of trial by jury."[5] *Id.* at 150. Later opinions picked up on this constitutional reliance and made it explicit. In *Parker v. Gladden*, for example, the Court held that a bailiff's statements to jury members that the defendant was guilty implicated a "federal question" and that such comments to a jury "are controlled by the command of the Sixth Amendment." 385 U.S. at 364. Even today, *Mattox* is described by the United States Supreme Court and the federal courts of appeals as part of the canon of decisions about the constitutional right to an impartial jury. *See, e.g., Dietz v. Bouldin*, 579 U.S. 40, 49 (2016); *United States v. Basham*, 561 F.3d 302, 319 (4th Cir. 2009).[6]

---

[5] *Mattox* explains that *People v. Knapp*, 3 N.W. 927 (Mich. 1879), "held" the above-mentioned proposition. 146 U.S. at 150. But the phrase does not appear in that opinion. Instead, *Mattox* also cites *Gainey v. People*, 97 Ill. 270, 281 (1881), in which the Illinois Supreme Court used a similar phrase to explain the holding of *Knapp*. 146 U.S. at 150.

[6] We acknowledge that we recently noted that the Supreme Court of the Territory of Utah did not "read *Mattox* to issue a constitutional requirement." *State v. Bess*, 2019 UT 70, ¶ 47 n.11, 473 P.3d 157 (referring to *People v. Ritchie*, 42 P. 209, 212–13 (Utah 1895)). But our comment and *Ritchie*'s conclusion pertained to another part of *Mattox*. Additionally, since our decision in *Bess*, the United States Supreme Court opined indirectly on the point, noting, in the context of jury unanimity, that "the Sixth Amendment affords a right to 'a trial by jury as understood and applied at common law, . . . includ[ing] all the essential elements as they were recognized in this country and England when the Constitution was adopted.'" *Ramos v. Louisiana*, 140 S. Ct. 1390, 1397 (2020) (alterations in original) (quoting *Patton v. United States*,

(continued . . .)

¶29 The federal courts of appeals, and state courts interpreting the Sixth Amendment, have followed cases like *Mattox* and *Parker* and closely scrutinized certain jury contacts with outsiders. *See, e.g., State v. Christensen*, 929 N.W.2d 646, 661 (Iowa 2019) ("The constitutional right to an impartial jury may be impaired by jury misconduct and jury bias."); *Oswald v. Bertrand*, 374 F.3d 475, 477 (7th Cir. 2004) (explaining that a jury must not decide guilt based on "extraneous sources of decision"); *United States v. Rigsby*, 45 F.3d 120, 123 (6th Cir. 1995) (stating that prejudice is presumed whenever a juror has an unauthorized, outside communication "that presents a likelihood of affecting the verdict"); *Tarango v. McDaniel*, 837 F.3d 936, 947 (9th Cir. 2016) ("*Mattox* and its progeny further establish that undue contact with a juror by a

---

281 U.S. 276, 288 (1930)). Although that is not a conclusive assessment of the scope of the right-to-an-impartial-jury clause, we think it has value when analyzing the impact of *Mattox* on current constitutional jurisprudence about the clause.

Contemporaneous cases that followed *Mattox* also viewed it as relating to the constitutional right to impartial jury. *See, e.g., People v. Dinsmore*, 36 P. 661, 662 (Cal. 1894) (A prosecution witness became indisposed during her testimony, and the trial court decided to postpone trial by more than two months and allowed the jury to separate without supervision. The California Supreme Court reversed, holding that "[t]he law is most jealous of these matters, in the interests of justice to all parties, and its care and anxiety to have a fair and impartial jury in every case is fully [exemplified] by the provisions of both constitution and statute." The court reasoned that "the chances largely preponderate that, under the circumstances here depicted, one or more of them did not return to the box at the expiration of the continuance in the same frame of mind as to the case as when he left it")*; United States v. Spencer*, 47 P. 715, 716 (N.M. 1896) (The jury was allowed to separate, drank alcohol during the trial and visited a saloon. The Supreme Court of New Mexico held that "[i]f jurors should be permitted to separate, . . . converse and mingle with people generally, then the sacredness and respect for trial by jury would be destroyed, and the practice of excluding juries from outside and external influences and temptations for tampering and bribery is nullified, and no litigant would be protected in his constitutional right of a fair and impartial trial by a jury").

10

government officer almost categorically risks influencing the verdict.").

¶30 The consistent thread that connects all these decisions is the concern for jury purity, alongside the threat to that purity caused when an outsider invades the jury's privacy. Indeed, "[i]t is of the utmost importance to the administration of justice that the purity of the trial by jury should be preserved." *Hines v. State*, 27 Tenn. (8 Hum.) 597, 601 (1848). Courts around the nation have not obsessed over the form of the intrusion, but rather on the principle guarding against it—"safeguard[ing] in every possible way the purity of the stream of justice; to prevent it from in any manner being polluted by influences other than that which are produced by the legal evidence and the law governing the case." *Bilton v. Territory*, 99 P. 163, 165 (Okla. Crim. App. 1909). That is because constitutions "enshrine[] principles, not application of those principles." *Maese*, 2019 UT 58, ¶ 70 n.23.

¶31 In sum, Utah's Constitution guarantees a defendant the right to an impartial jury, and that right includes protection from improper contacts between the jury and others during trial. The federal courts, and other state courts interpreting the Sixth Amendment, hold that the U.S. Constitution provides the same protection. We now turn to how we effectuate this protection—a rebuttable presumption of prejudice.

## B. The Presumption of Prejudice

¶32 Once an improper jury contact is shown, "prejudice is presumed," *Thorne*, 117 P. at 66, and "the burden is on the prosecution to prove that the unauthorized contact did not influence the juror." *Pike*, 712 P.2d at 280.

¶33 The presumption of prejudice is rooted in the constitutional requirement that verdicts need to "be above suspicion as to [whether they were] influenced by any conduct on [any juror's] part during the trial."[7] *Anderson*, 237 P. at 944. Accordingly, we have "long taken a strict approach in assuring that the constitutional guarantee of a fair trial not be compromised

---

[7] As the Utah and federal cases we discuss throughout this opinion make clear, jury "conduct" is not limited to affirmative and intentional actions taken by a juror. It also includes inadvertent conduct and communications directed at a juror.

by improper [jury] contacts." *Pike*, 712 P.2d at 279; *see also State v. Ahrens*, 479 P.2d 786, 787–88 (Utah 1971); *Crank*, 142 P.2d at 194.

¶34 In keeping to this strict approach, we have recognized that certain jury contacts may be expected to "consciously or unconsciously . . . influence the judgment of the juror." *Anderson*, 237 P. at 943; *see supra* ¶ 25. In such situations, "[t]o say that the accused cannot sustain his claim of prejudice until he also shows that the juror talked about something harmful to the accused's rights is to fritter away the constitutional and statutory provisions requiring the jury to be kept secluded from all outside influences." *Thorne*, 117 P. at 67. Therefore, we have said that "prejudice is presumed" in such instances, *id.* at 66, "unless the prosecution shows beyond reasonable doubt that the [defendant] has received no injury by reason thereof." *State v. Morgan*, 64 P. 356, 360 (Utah 1901). In *Pike*, we synthesized our prior case law and provided a useful starting point for the improper-contacts analysis—juror contacts with "witnesses, attorneys or court personnel" that go "beyond a mere incidental, unintended, and brief contact" will typically trigger a rebuttable presumption of prejudice. 712 P.2d at 280.

¶35 *Pike* provided two main reasons for why a rebuttable presumption is required. These reasons are deeply rooted in the jurisprudence of this court and from across the nation, even well before the ratification of the Utah Constitution.

¶36 First, as already alluded to, it is exceedingly difficult to prove "how or whether a juror has in fact been influenced by" interactions with third parties. *Id.* at 280. Positive or negative impressions, humorous feelings, expectations, or any such unintended and unseen psychological coercion may spring from such interactions and exert influence upon the deliberations of a juror, "consciously or unconsciously." *See Anderson*, 237 P. at 943. Our court of appeals has similarly explained that "it is difficult, if not impossible, to prove how an improper contact may have influenced a juror." *State v. Swain*, 835 P.2d 1009, 1011 (Utah Ct. App. 1992) (citing *Pike*, 712 P.2d at 280 for this proposition).

¶37 Second, we want to avoid the "deleterious effect upon the judicial process" created by even "the appearance of impropriety," *Pike*, 712 P.2d at 280, thereby keeping "judicial administration . . . above suspicion as regards weighing out justice," *Thorne*, 117 P. at 67. For when a defendant's liberty is at stake, there can be no doubt as to the validity and impartiality of a jury verdict which, "like Caesar's wife, *must be above suspicion*," *Crank*, 142 P.2d at 194.

12

As our court of appeals observed shortly after *Pike*, we have "reversed criminal convictions based solely on the appearance that [the right of an accused to an impartial jury] may have been jeopardized." *State v. Woolley*, 810 P.2d 440, 442 (Utah Ct. App. 1991).

¶38 In sum, Utah jurisprudence forcefully holds that once a court is apprised of an improper jury contact, a rebuttable presumption of prejudice attaches.[8] The question, then, is whether the jury contact at issue in the present case triggered the presumption. We now address that question and answer it in the affirmative.

## II. SOTO WAS ENTITLED TO A REBUTTABLE PRESUMPTION OF PREJUDICE

¶39 This court has never addressed a factual scenario substantially like the one at bar. We have not decided whether suggestions of a defendant's guilt, made to the jury by out-of-court personnel who nevertheless represent the authority of the state and the state's criminal justice system, trigger the presumption of prejudice. Still, our case law has consistently utilized an analytical

---

[8] The federal courts are less clear on if and when the presumption attaches. *See, e.g.*, Eva Kerr, Note, *Prejudice, Procedure, and a Proper Presumption: Restoring the* Remmer *Presumption of Prejudice in Order to Protect Criminal Defendants' Sixth Amendment Rights*, 93 IOWA L. REV. 1451, 1463–77 (2008) (surveying the federal circuit split regarding the presumption and documenting six different approaches); Anna H. Tison, Recent Development, United States v. Lawson: *Problems with Presumption in the Fourth Circuit*, 91 N.C. L. REV. 2244, 2251–56 (2013) (presenting three dominant approaches). Regardless, Utah jurisprudence interpreting article I, section 12 of our state constitution stands solidly on its own two feet in applying the presumption to improper jury contacts. And because no party argues that our case law fails to satisfy the minimum requirements of jury impartiality under the Sixth Amendment, we root our analysis today in the Utah Constitution. Indeed, we "have authority to construe [our] own constitutional provisions however [we] wish" and we are not compelled by "federal interpretations" as long as we do not "violate a federal requirement." JEFFREY S. SUTTON, 51 IMPERFECT SOLUTIONS 16 (2018).

framework that considers *who* said *what* and the *circumstances* surrounding the contact.[9] When this balancing test indicates that a juror contact "would or might, consciously or unconsciously, tend to influence the judgment of the juror," the defendant is entitled to a rebuttable presumption of prejudice. *State v. Anderson*, 237 P. 941, 943 (Utah 1925).

¶40 In *State v. Pike*, this court articulated a general guideline that "any unauthorized contact during a trial between witnesses, attorneys or court personnel and jurors [that] goes beyond a mere incidental, unintended, and brief contact" will trigger the presumption of prejudice. 712 P.2d 277, 280 (Utah 1985). The parties here dispute whether the term "court personnel" applies only to in-court personnel or also includes out-of-court personnel unaffiliated with the case. But rather than mandate a categorical rule as to what statements by what court personnel necessarily trigger the presumption, we look to the rationale underlying *Pike*. That is to say, we return to our analysis of *who* said *what* and the *circumstances*. We first discuss the elements of this analysis and how this court and the court of appeals have applied those elements in past cases. We then apply those elements to this case and hold that the contacts here triggered the presumption of prejudice.

*A. Who Made the Contact*

¶41 The critical first inquiry is the identity of the person with whom the jury made contact. The more important the speaker in the proceedings, or the more authoritative the speaker within the criminal justice system, the more likely we are to presume prejudice. Despite the urgings of the parties, we decline to adopt any categorical rule as to which "court personnel" might trigger the presumption. This is because not all "court personnel" are equal in the eyes of a jury, and the question of *who* made the contact is only the first step of our inquiry.

---

[9] The dissent argues that we are "develop[ing] a new balancing test to determine whether a particular instance of unauthorized jury contact triggers a presumption of prejudice." *See infra* ¶ 130. Not so. As we explain in depth in this opinion, the balancing test comes not from our imagination, but from our case law, and specifically from past cases analyzing *who* said *what* and the *circumstances* of the contact.

¶42 We are more likely to assume prejudice when a juror contact is made by an individual whose credibility the jury may need to assess. As *Pike* notes, such individuals include "witnesses" and "attorneys." *Id.* And our case law is clear that outside contacts "beyond a mere incidental, unintended, and brief contact" between jurors and witnesses or attorneys will trigger the presumption. *Id.*; *see also id.* at 280–81 (applying the presumption of prejudice to a brief conversation between an officer-witness and jurors because the nature of the conversation "no doubt had the effect of breeding a sense of familiarity that could clearly affect the jurors [sic] judgment as to credibility"); *State v. Erickson*, 749 P.2d 620, 621 (Utah 1987) (holding that a four- or five-minute conversation between a juror and a key state witness about personal matters unrelated to the trial "was more than a brief, incidental contact where only remarks of civility were exchanged" and thus triggered the rebuttable presumption of prejudice); *Anderson*, 237 P. at 944 (applying the presumption because a juror rode daily to and from the court with a witness during the three-week trial); *State v. Swain*, 835 P.2d 1009, 1011 (Utah Ct. App. 1992) (applying the rebuttable presumption of prejudice when a juror and a witness talked about their high school reunion because it "was clearly beyond the mere exchange of civility").

¶43 But our case law is concerned not just with the *credibility* of the speaker, but also their *authority*. We are more likely to assume prejudice when outside jury contacts are made by authoritative speakers—individuals who are neither witnesses nor advocates in the trial, whose credibility is not at issue, but who nevertheless carry greater influence over a juror than an everyday citizen.

¶44 Our cases involving jury contacts between judges and bailiffs illustrate this reasoning. For example, in *State v. Maestas*, we stated that "it may be appropriate to presume prejudice" when "the judge discusses substantive matters with jurors." 2012 UT 46, ¶ 70, 299 P.3d 892. "In such cases, the judge's communication may have influenced the jury in unknown ways that could potentially affect the outcome of the case." *Id.* And in *State v. Garcia*, we said that a judge must not communicate with a juror "on any subject connected with the trial." 355 P.2d 57, 59 (Utah 1960). Ultimately, we decided in both cases that the presumption did not apply because the judge did not discuss substantive matters with the juror. *Maestas*, 2012 UT 46, ¶¶ 69–70; *Garcia*, 355 P.2d at 59. Still, these cases stand for the well-understood premise that even though judges act as neutral arbiters whose credibility a juror need

not assess, their words carry great weight with a jury because of their authority within the courtroom.

¶45 Similarly, our court of appeals has given greater consideration to outside contacts made by bailiffs. In *Logan City v. Carlsen*, the court of appeals applied *Pike*'s language—that contacts by "court personnel" are likely to trigger the presumption of prejudice—to comments made by a bailiff to the jury regarding various courts' jurisdiction and sentencing authority. 799 P.2d 224, 225–27 (Utah Ct. App. 1990). The court noted "how a seemingly innocent response by the bailiff to a juror's question opens a Pandora's box of possibilities of improper juror influence and the appearance of impropriety." *Id.* at 226; *see also State v. Ham*, 2006 UT App 278, paras. 4–6 (applying *Pike* to a juror contact with a bailiff on the first day of trial but finding the contact to be "incidental and brief"); *State v. Hale*, 2000 UT App 297, paras. 2–4 (applying the *Pike* test to a comment made by a bailiff *not assigned to the case* but concluding the same).

¶46 The federal courts have likewise found the *authority* of the speaker to be relevant to Sixth Amendment analyses. In *Remmer v. United States*, the United States Supreme Court considered a situation in which an F.B.I. agent investigated a juror during trial in response to an alleged bribe. 347 U.S. 227, 228 (1954). Although the details of what transpired between the juror and agent were unknown, the court presumed prejudice to the defendant: "The sending of an F.B.I. agent in the midst of a trial to investigate a juror as to his conduct is bound to impress the juror and is very apt to do so unduly." *Id.* at 229. The court continued: "A juror must feel free to exercise his functions without the F.B.I. or anyone else looking over his shoulder." *Id.*

¶47 Later, in *Parker v. Gladden*, the Court considered comments made by a bailiff to a jury suggesting that the jury should convict. 385 U.S. 363, 363–64 (1966) (per curiam). The prosecution argued that "no harm could have resulted" because ten out of twelve jurors later testified to not hearing the comments. *Id.* at 365. The Court rejected this argument, explaining that it "overlooks the fact that *the official character of the bailiff*—as an officer of the court as well as the State—*beyond question carries great weight* with a jury which he had been shepherding for eight days and nights." *Id.* (emphases added). The Court also found the number of jurors potentially influenced by the comments to be of no moment: "In any event, petitioner was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors." *Id.* at 366.

¶48 Citing *Remmer* and *Parker*, the Ninth Circuit has concluded that "undue contact with a juror by a government officer almost categorically risks influencing the verdict." *Tarango v. McDaniel*, 837 F.3d 936, 947 (9th Cir. 2016); *see also Godoy v. Spearman*, 861 F.3d 956, 967 (9th Cir. 2017). In *Godoy*, a juror kept regular contact during trial with a "judge friend," unconnected to the case, who explained procedural details to the juror, which she in turn shared with the rest of the jury. 861 F.3d at 960. The court held that although the judge "was not a state officer 'entangled in this case,' his status as a judge is nonetheless relevant to the [presumption] inquiry." *Id.* at 969 (citation omitted). "The weight a judge's comments would carry with the jury greatly increases the risk that his advice about the case swayed its decision." *Id.* And the court concluded that even procedural questions, "such as why certain evidence was excluded, or how the jury was to determine guilt, could certainly influence the jury's decision." *Id.* at 969–70.

¶49 These Utah and federal cases illustrate how communications by out-of-court personnel who nevertheless represent state authority are likely to influence a juror. On the other hand, non-authoritative court personnel, such as law clerks, administrative staff members, or cafeteria workers, are less likely to influence a juror. Yet we stop short of saying that all such individuals should be treated the same as average laypeople in the presumption analysis. Say, for example, a juror conversed with the court librarian about whether the trial judge tends to give harsh sentences to criminal defendants. A court might rightly conclude that the librarian's answer is more likely to influence the juror than if the juror had asked a person on the street.

¶50 To summarize, *Pike* provides a convenient springboard for the *who* analysis—statements by "witnesses, attorneys or court personnel" are more likely to influence a juror.[10] 712 P.2d at 280.

_____

[10] *Pike* itself implies that it did not intend to declare a bright-line rule. At one point, the opinion states: "The rule in this jurisdiction is that improper juror contact with *witnesses or parties* raises a rebuttable presumption of prejudice." *Pike*, 712 P.2d at 280 (emphasis added). But it also says: "We have long taken a strict approach in assuring that the constitutional guarantee of a fair trial not be compromised by improper contacts between jurors and *witnesses, attorneys, or court personnel*." *Id.* at 279 (emphasis added). We take this potentially conflicting rule language to suggest what

(continued . . .)

Still, not all "court personnel" are the same. Those who represent state authority—in particular, the authority of the criminal justice system—are more likely to "consciously or unconsciously . . . influence the judgment of the juror." *Anderson*, 237 P. at 943. Whereas run-of-the-mill court employees are less likely to do so. The State and the dissent both resist this conclusion and propose categorical rules limiting the scope of "court personnel." We find their arguments unpersuasive.

¶51 The State argues that the patrolman and the IT technician were "court personnel" but not "court participants—individuals participating in the proceedings." This distinction matters to the State because it views this court's precedent as limited to comments made to the jury by trial or in-court participants: witnesses, attorneys, and courtroom staff. And it asks us to not "extend" our case law to include court personnel not involved in the case the jury must decide.

¶52 We reject the State's argument for three reasons. First, the State essentially asks us to limit our precedents to their facts. But we have explained that stare decisis "requires us to extend a precedent to the conclusion mandated by its rationale," not its facts. *Pleasant Grove v. Terry*, 2020 UT 69, ¶ 41, 478 P.3d 1026 (citation omitted) (internal quotation marks omitted); *see also Neese v. Utah Bd. of Pardons & Parole*, 2017 UT 89, ¶ 58, 416 P.3d 663. The rationale of our improper-contacts cases draws no categorical distinction between in-court and out-of-court personnel.

¶53 Second, the State points to our statement in *State v. Allen* that the presumption "only applies when the contact is between a juror and *other court participants*, not jurors and third parties unrelated to the proceedings." 2005 UT 11, ¶ 51, 108 P.3d 730. However, the court made that statement in response to the defendant's argument that, given the public nature of the trial, a juror's contact with her spouse somehow amounted to contact with "court personnel." *See id.* at ¶¶ 51–53. Thus, that statement was meant to highlight the chasm of difference between juror contacts with truly disinterested parties—such as a spouse—and juror contacts with individuals participating in a proceeding or

we expressly expound today: that "court personnel" will often carry greater weight in the improper contacts analysis than the everyday citizen, but it still comes down to *who* said *what* and the *circumstances*.

representing the authority of the state courts system. Further, and as we elucidate below, we cannot conceive or concede that an individual who is not an active participant in the proceedings, but who is still an authoritative figure within the criminal justice system, would necessarily be "unrelated to the proceedings." *Cf.* UTAH CODE JUD. CONDUCT R. 1.2 cmt. 3 ("Conduct that compromises or appears to compromise the independence, integrity, and impartiality of a judge undermines public confidence in the judiciary.").

¶54 Third, the State's position would invite the appearance of impropriety. To say that comments to a juror by a judge, bailiff, or police officer not affiliated with the proceedings are tantamount to those made by an everyday citizen would not keep the purity of the jury "above suspicion." *See Anderson*, 237 P. at 944; *see also* UTAH CODE JUD. CONDUCT R. 1.2 ("A judge should act at all times in a manner that promotes—and shall not undermine—public confidence in the independence, integrity, and impartiality of the judiciary and shall avoid impropriety and the appearance of impropriety."); *supra* ¶¶ 33, 37.

¶55 The court of appeals' example colorfully illustrates the absurdity of the State's proposal: "Consider a hypothetical encounter where another trial court judge enters a nonpublic, court-employee elevator with the jury and urges the jury to convict the defendant because, in the judge's experience, criminal defendants are 'almost always' guilty and deserve to be convicted '99 times out of 100.'" *State v. Soto*, 2018 UT App 147, ¶ 16 n.2, 427 P.3d 1286. Under the State's view, that behavior would not trigger a rebuttable presumption of prejudice because the judge was not a "participant[] in the case the jurors must decide." Nor would it matter to the State if the entire Utah Supreme Court, robes and all, were in the elevator and said the same thing to a juror. We agree with the court of appeals that "such an encounter . . . would surely violate the right to an impartial jury and trigger the rebuttable presumption of prejudice" because of the perceived authority of the judge (or justices) as agents of state power. *See id.*

¶56 Similar to the State, the dissent argues that *Pike* used the term "court personnel" as "a synonym for court participants or *courtroom* personnel." *Infra* ¶ 134. The dissent acknowledges that a rebuttable presumption of prejudice attaches when jurors have "unauthorized contact" with "witnesses, attorneys or court personnel." *Pike*, 712 P.2d at 280. But the dissent does not believe that the facts of Soto's case implicate this rule because the highway patrolman and IT technician were not "court participants or

*courtroom* personnel." *Infra* ¶¶ 133–34. Like the State's argument, this reading is narrower than ours, *see supra* ¶¶ 50, 50 n.10, and we similarly reject it.

¶57 We believe that the dissent's underlying rationale for its narrow interpretation of "court personnel" is also inconsistent with our case law. The dissent posits that such individuals are not more likely to trigger the presumption of prejudice because they have no stake in the outcome of the trial or because a juror never needs to assess their credibility or determine their rights. *Infra* ¶¶ 113, 135–37. Yet Utah courts have repeatedly assessed juror contacts with judges or bailiffs under a more heightened standard than they use for juror contacts with ordinary citizens. *Supra* ¶¶ 44–45. The federal courts have likewise done so under the Sixth Amendment, including juror contacts with other government agents. *Supra* ¶¶ 46–48. Under the dissent's theory, these cases all should have treated the contacts as no different from juror contacts with everyday citizens because the court personnel involved had no interest in the outcome of the trial or because the jurors never needed to assess the credibility of, or decide the rights of, such individuals.

¶58 Besides disagreeing with our reading of the case law in this area, the dissent also relies on Utah Rule of Civil Procedure 47(*l*) in its analysis. *See infra* ¶¶ 113, 122. Indeed, it bases its analytical framework for its three rules of jury contact on our rules of procedure. *Compare* UTAH R. CIV. P. 47(*l*) ("There shall be no off-the-record communication between jurors and lawyers, parties, witnesses or persons acting on their behalf."), *with* Dissent I.A ("Jurors and trial participants must not communicate outside of the trial"); *compare* UTAH R. CRIM. P. 17(*l*) (while the jury is deliberating, "they shall be kept together," and "the officer having them under [his or her] charge shall not allow any communication to be made to them"), *with* Dissent I.C ("During deliberations, the jury may not separate or communicate with anyone"); *compare* UTAH R. CIV. P. 47(*l*) ("Jurors shall not communicate with any person regarding a subject of the trial."), *with* Dissent I.B ("Jurors may not have off-the-record communications with any person about a subject of the trial"). While our rules provide useful guidelines for juror behavior, they do not and cannot supplant our case law interpreting the breadth of the constitutional right to trial "by an impartial jury." UTAH CONST. art. I, § 12; U.S. CONST. amend. VI. Nor do the rules prescribe the remedy for their violation.

¶59 Fortunately, rule 47(*l*)'s limitations on outside communications are broader than our constitutional limits and thus create no constitutional problems. Most notably, rule 47(*l*) prohibits a juror from communicating with "*any person* regarding a subject of the trial." UTAH R. CIV. P. 47(*l*) (emphasis added). This rule prescribes a noble standard of juror behavior, but it does not tell us when a court must presume prejudice from such communication. To answer that question, we must look to our case law. For example, a juror's communication with her spouse about a procedural matter of the trial did not trigger the presumption because of the unimportance of *who* communicated with the juror. *See Allen*, 2005 UT 11, ¶¶ 47, 53. Conversely, a bailiff's comments to a juror regarding sentencing triggered the presumption, in part because of the importance of *who* made the communication. *Carlsen*, 799 P.2d at 226.

¶60 Similarly, rule 47(*l*)'s prohibition on all "off-the-record communication between jurors and lawyers, parties, witnesses or persons acting on their behalf" does not tell us when we should presume prejudice for its violation. Our cases explain we will presume prejudice when such a communication "goes beyond a mere incidental, unintended, and brief contact." *Pike*, 712 P.2d at 280. We further explain this below when we address *what* was said.

¶61 In short, the dissent's reliance on rule 47(*l*) is misplaced.[11] When deciding whether a juror contact with an outsider triggers the rebuttable presumption of prejudice, we do not apply rule 47(*l*). We instead analyze *who* said *what* and under what *circumstances*. At the threshold inquiry—*who* communicated with the juror—we consider both the extent that the individual's credibility must be weighed by the jury and the individual's authority within the criminal justice system at large. The more at issue the speaker's credibility is, or the more authoritative the speaker, the more likely we are to apply the presumption of prejudice.

---

[11] To the extent the rule has any play in this matter, its broad prohibitions on juror contacts cut against the dissent's narrow proposed application of the presumption.

*B. What Was Said*

¶62 The second step in the improper-contacts inquiry is *what* was communicated to the juror. The more the communication is directly relevant to the trial, the more likely it is to trigger the presumption of prejudice. This is, perhaps, most true when a speaker opines on the defendant's guilt. Conversely, communications unrelated to the trial are less likely to trigger the presumption.

¶63 Again, our case law helps to illustrate these parameters. We begin with communications directly related to the proceedings. In *Carlsen*, the court of appeals applied the presumption when a bailiff answered a juror's questions that "touched on the extremely sensitive issue of sentencing." 799 P.2d at 226. And in *State v. Larocco*, that court addressed a brief conversation regarding the credibility of police officers, which between a juror and "a minor witness whose testimony was uncontroverted." 742 P.2d 89, 95–96 (Utah Ct. App. 1987), *rev'd on other grounds*, 794 P.2d 460 (Utah 1990). The court considered "the content of the conversation" (the credibility of police officers) to be the "critical issue" and accordingly applied the presumption of prejudice. *Id.* at 96.

¶64 In the federal realm, the United States Supreme Court applied the presumption of prejudice when a bailiff told jurors: "Oh that wicked fellow (petitioner), he is guilty," and "[i]f there is anything wrong (in finding petitioner guilty) the Supreme Court will correct it." *Parker*, 385 U.S. at 363–65. And in *Godoy*, the Ninth Circuit presumed prejudice when a juror communicated with an external "judge friend," in part because the judge explained procedural details of the case. 861 F.3d at 964. The court explained: "Procedural guidance on questions such as why certain evidence was excluded, or how the jury was to determine guilt, could certainly influence the jury's decision." *Id.* at 969–70. These cases show how outside juror contacts discussing substantive, or even procedural, matters of the case are more likely to trigger the presumption of prejudice.

¶65 On the other end of the spectrum, brief and innocent contacts unrelated to the case are unlikely to trigger the presumption. *See Maestas*, 2012 UT 46, ¶ 70 (not applying the presumption when the "judge's communication with the jury did not involve any substantive issues; instead, the interaction was brief and dealt with the timing of the jury's dismissal for the day"); *State v. Durand*, 569 P.2d 1107, 1109 (Utah 1977) (holding that the

rebuttable presumption of prejudice was not triggered when jurors briefly had coffee at the sheriff's office in the presence of several officer-witnesses, as it was a "minor" showing of impropriety); *Garcia*, 355 P.2d at 59 (not presuming prejudice when a juror approached the judge with a question regarding the trial and the judge "acted properly and did not attempt to solve the juror's problems, but merely told him he would ask counsel about it"); *State v. Day*, 815 P.2d 1345, 1349–50 (Utah Ct. App. 1991) (holding that the presumption was not triggered when, by order of the judge, an officer–witness and a bailiff drove a juror one or two miles to reunite him with the other jurors and no conversation took place); *State v. Jonas*, 793 P.2d 902, 908–10 (Utah Ct. App. 1990) (holding that the presumption did not arise when a bailiff let jurors know why another juror was excused because "[h]is brief contact concerning something tangential to the trial itself did not give rise to any appearance of impropriety").

¶66 Putting *who* and *what* together, we see how these two prongs of our balancing test interact. At one extreme, communications with jurors by individuals having little or no connection with the courts or criminal justice system not regarding the case at hand will not trigger the presumption of prejudice. At the other extreme, communications by important or authoritative individuals associated with the courts or criminal justice system regarding a sensitive matter of the trial such as the defendant's guilt or a key witness's credibility will almost invariably trigger the presumption. The remaining scenarios will fall somewhere in between and require the trial court to engage in a careful, fact-intensive balancing of *who* said *what*. However, the court will still need to consider any special *circumstances* of the communication, which we now discuss.

### C. Special Circumstances

¶67 While the above analysis of *who* said *what* will generally suffice, in some situations the *circumstances* of a juror contact may alter this calculus. We need not exhaustively catalog all such circumstances here, but we provide a few examples to make the point.

¶68 One such special circumstance is jury deliberations. Utah and federal courts have afforded deliberating juries an extra level of protection from outside influences. For example, in *State v. Thorne*, a juror left his lunch table during deliberations and went with an officer of the court to another part of the building, where he spoke on the phone. 117 P. 58, 66 (Utah 1911). Even though the

identity of the speaker and what was said were unknown, the court presumed prejudice. *Id.* The court explained that "[t]o say that the accused cannot sustain his claim of prejudice until he also shows that the juror talked about something harmful to the accused's rights is to fritter away the constitutional and statutory provisions requiring the jury to be kept secluded from all outside influences." *Id.* at 67. And in *Mattox v. United States*, the United States Supreme Court held that "the separation of the jury in such a way as to expose them to tampering, may be reason for a new trial," subject to a rebuttable presumption of prejudice. 146 U.S. 140, 149 (1892).[12]

---

[12] *Thorne*, decided in 1911, discussed the "constitutional . . . provision[] requiring the jury to be kept secluded from all outside influences" during deliberations. 117 P. at 67. However, neither our constitution nor the federal constitution expressly mentions jury deliberations. *See* UTAH CONST. art. I, § 12; U.S. CONST. amend. VI. Still, *Thorne* referred to the "safeguards . . . at common law deemed essential to the right itself of trial by jury" which had "been preserved in this country by Constitutions and statutes." 117 P. at 67. Presumably, the opinion borrowed from the United States Supreme Court's construction of the Sixth Amendment in cases like *Mattox* and from other state courts' constructions of their own constitutional provisions protecting jury impartiality during deliberations. *See, e.g.*, *Mattox*, 146 U.S. at 150 (discussing cases involving invasions of jury deliberations from Michigan, Kansas, and Illinois).

The basic premise of cases like *Thorne* and *Mattox*—that we apply a heightened level of protection from outside influences during jury deliberations—is also reflected in our rules of procedure. *See* UTAH R. CRIM. P. 17(*l*) (while the jury is deliberating, "the officer having them under [his or her] charge shall not allow *any* communication to be made to them . . . ." (emphasis added)).

Perhaps the reason for this heightened protection during deliberations is the difficulty in discovering and curing defects in jury impartiality at this stage in the trial, immediately before the verdict is announced. But when an unauthorized juror contact occurring before deliberations becomes known to the court and can be addressed prior to the verdict's reading, we are not convinced that the basic analysis applied by *Pike* and its

(continued . . .)

¶69 *Thorne* and *Mattox* highlight a second circumstance that warrants greater protection: capital cases.[13] *See* 117 P. at 67; 146 U.S. at 149–50. Indeed, our constitution states: "In capital cases the right of trial by jury shall remain inviolate." UTAH CONST. art. I, § 10. While this is not an additional substantive protection of the right to "trial by an impartial jury" guaranteed by article I, section 12, this court has at times treated article I, section 10 as reinforcing that right. *See, e.g.*, *State v. Young*, 853 P.2d 327, 394 (Utah 1993). Perhaps nowhere is it more important that there be heightened jury protections and the appearance of propriety throughout the proceedings than in capital cases, when a defendant's life is literally on the line. *See Gardner v. Florida*, 430 U.S. 349, 358 (1977) ("It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion."); *State v. Brown*, 607 P.2d 261, 271 (Utah 1980) (explaining that the State must use "scrupulous care" when prosecuting capital cases).

¶70 To be clear, these two examples do not define the universe of special circumstances that may affect our analysis. But they highlight the fact-intensive nature of the inquiry.

\* \* \*

¶71 We have now described the framework for deciding when a court must apply a rebuttable presumption of prejudice due to an unauthorized contact with the jury. The court should consider *who* made the contact, *what* was said, and the *circumstances* of the contact to determine if the contact was likely to "consciously or unconsciously . . . influence the judgment of the juror." *Anderson*, 237 P. at 943. This is necessarily a case-specific and fact-intensive inquiry, and the end goal should always be to ensure that the defendant's right to trial by an impartial jury has been maintained "above suspicion." *See id.* at 944; *supra* ¶¶ 33, 37.

---

predecessors—balancing *who* said *what* and any other special *circumstances*—should be any different. After all, our state and federal constitutions guarantee the right to an "impartial jury," not "impartial jury deliberations."

[13] We save for another day the question of to what extent some of the language in *Thorne* and *Mattox* relied on the cases being both capital cases and jury-deliberation cases.

## II. SOTO WAS ENTITLED TO A REBUTTABLE PRESUMPTION OF PREJUDICE

¶72 Having explicated the test we use for unauthorized jury contacts, we now apply it to Soto's claim. We analyze *who* made the contact, *what* was said, and the *circumstances*. We find all three of these elements weigh in favor of applying a rebuttable presumption of prejudice.

¶73 At the threshold, we acknowledge a peculiarity of this case regarding who said what. Here, two individuals communicated with the jury. The jurors generally agreed to the following baseline. A uniformed highway patrolman assigned to guarding the Supreme Court was already on the elevator when the jury entered it. He said something to the effect of, "oh, looks like a jury, do you want me to tell you how this ends?" A few seconds later, a court IT technician entered the elevator and said something akin to, "you guys look like a jury . . . can you say guilty?"

¶74 Still, several of the jurors, when later interviewed by the court, expressed confusion about who said exactly what. Juror one testified that the IT technician "said something jokingly like convict him or hang him." Juror three thought that the IT technician said, "[y]ou can already tell he's guilty." And juror five told the court: "I heard the patrolman, the Highway Patrolman say, [j]ust say he's guilty."[14]

¶75 In sum, the patrolman most likely said, "do you want me to tell you how this ends?" But he also potentially said, "[j]ust say he's guilty." The IT technician probably said, "can you say guilty?" But he also potentially said, "you can already tell he's guilty," or even worse, "convict him or hang him." Having clarified who said what as much as possible, we now apply our test.

---

[14] For purposes of a prejudice analysis, the trial court need not make a factual determination of what exactly was said. And we certainly are not in a position to do so on appeal. Ultimately, the inquiry hinges not on the intent or precise words of the speaker but on the effect on the juror—whether the communication was likely to "consciously or unconsciously . . . influence the judgment of the juror." *State v. Anderson*, 237 P. 941, 943 (Utah 1925). So, in this situation, we focus primarily on what was *heard* versus what was *said*.

*A. Who — The Highway Patrolman Was a Person of Authority; the IT Technician Was Less So*

¶76 First, we consider *who* made the contact. As explained above, courts have regularly given greater weight in the unauthorized-contacts analysis to out-of-court personnel who nevertheless represent state authority. *Supra* ¶¶ 44–48. The patrolman fits squarely into this category. Nothing in the record details his appearance. However, from the fact that the jurors immediately recognized him as a highway patrolman, we logically assume that he was in full uniform, including carrying a firearm. He was truly clad in the authority of the State. The effect of that appearance cannot be taken lightly. *See Aylward v. State*, 113 So. 22, 24 (Ala. 1927) ("The sheriff was in authority; it is safe to assume that in the mind of the juror he represented the state, the law . . . ."). We agree with the court of appeals that:

> [H]ighway patrol officers are regularly involved in criminal trials as witnesses and are seen as authoritative figures—perhaps all the more so in the case of one assigned to protect the justices of the State's highest court. Any comments made by a highway patrol officer about a defendant's guilt could influence a juror, consciously or not.

*State v. Soto*, 2018 UT App 147, ¶ 22, 427 P.3d 1286.

¶77 The IT technician was a less authoritative figure than the patrolman. Unlike the patrolman, none of the jurors seemed to identify the IT technician as any certain breed of state employee. Still, the IT technician was riding the court's employee elevator (not open to the public) and immediately recognized the jury as such. A juror could reasonably and readily conclude that the IT technician was a court employee and, therefore, probably knew more about criminal trials than the average layperson. And more importantly, as we explain further below, the jury could have interpreted the patrolman's and bailiff's reactions to the IT technician's comments as implicit ratifications of those comments, giving greater weight and authority to the IT technician's words.

*B. What — The Communications Suggested Soto's Guilt*

¶78 Our cases stand for the unsurprising thesis that the more directly relevant the content of the communication is to the trial, the more likely we are to presume prejudice. *Supra* ¶¶ 62–65. And this is especially true when the communication suggests the defendant's guilt. *See supra* ¶¶ 62–64.

¶79 Here, *what* was said was quite damning. The patrolman plausibly said, "do you want me to tell you how this ends?" This alone, in isolation, could be interpreted as a suggestion of guilt and, therefore, prejudicial to Soto. Further, we again agree with the court of appeals that when the patrolman did not "correct[] the IT technician when [the IT technician] suggested that Soto was guilty, the highway patrol officer implied either that he knew something about Soto's case or that criminal defendants are invariably guilty." *Soto*, 2018 UT App 147, ¶ 22. In addition, according to at least one juror, the patrolman said, "just say he's guilty." At the risk of stating the obvious, "just say he's guilty" is a clear suggestion of Soto's guilt.

¶80 The IT technician's statements were even worse. The jurors largely agreed that he said words to the effect of, "can you say guilty?" But he also potentially said, "you can already tell he's guilty" or "convict him or hang him." Again, these are all suggestions of guilt, and it is hard to imagine a more prejudicial statement than "hang him." This suggests not only guilt, but also contempt for the defendant—an emotional reaction to the defendant that goes beyond a merely factual suggestion of guilt.

*C. Circumstances—The Bailiff's Silence Could Be Considered an Implicit Endorsement of the Communications*

¶81 Rounding out our analysis, we consider any further *circumstances* that may mitigate or aggravate the contact. *Supra* ¶¶ 67–70. Here, we find relevant the presence of the bailiff and his failure to intervene or admonish the other two communicators.

¶82 Courts have traditionally viewed bailiffs as important and authoritative figures whose words carry significant weight with a jury, even outside of the jury-deliberations context. *See supra* ¶¶ 44–45, 47; *Parker v. Gladden*, 385 U.S. 363, 363–64 (1966) (per curiam); *Logan City v. Carlsen*, 799 P.2d 224, 226 (Utah Ct. App. 1990); *cf. State v. Hale*, 2000 UT App 297, paras. 3–4; *State v. Ham*, 2006 UT App 278, paras. 4–6. This case further demonstrates how, in some circumstances, even a bailiff's silence can potentially influence the jury. After all, a juror likely understands that part of a bailiff's duties, as shepherd of the jury, is to insulate the jury from external, potentially prejudicial contacts. Indeed, the court here told the jury upon swearing them in that "if anybody is involved at all in the trial with the exception of myself and my bailiffs, if they come to talk to you, please let my bailiff know immediately and we'll take care of that."

¶83 Here, the patrolman and IT technician said things like "do you want me to tell you how this ends" and "can you say guilty," or worse. A juror could potentially think that the bailiff's silence meant he found nothing inappropriate about these statements because, in essence, they were accurate. Thus, a juror could consider the bailiff's silence as a tacit endorsement of those statements—giving further weight to both communications.[15]

*D. The Comments Triggered the Rebuttable Presumption of Prejudice*

¶84 Putting it all together, we conclude that Soto was entitled to a rebuttable presumption of prejudice. Regarding the patrolman, an individual literally clothed in state authority suggested to the jury that the defendant was guilty. Meanwhile, the bailiff's silence could have implicitly validated his statements. In other words, an authoritative speaker (*who*) made substantive comments about a key aspect of the case (*what*) that could have been perceived as being endorsed by another authoritative individual (*circumstances*). This alone is sufficient to trigger the presumption.

¶85 When considered with the patrolman's statements, the IT technician's statements support our holding that the presumption is triggered. Because we already hold that the patrolman's statements alone were sufficient to trigger the presumption of prejudice, we need not decide if the IT technician's statements alone would also do so. We simply conclude that the IT

---

[15] The dissent disagrees with our statement that the bailiff's silence potentially (or arguably) conveyed approval of the comments to the jurors, and argues that there is "no record support for" such speculation and that "the trial court made no factual findings" on the matter. *Infra* ¶ 148 n.25. Nowhere in this opinion have we made any factual finding that the silence conveyed approval to the jury, or made assumptions about how the specific jurors in this case were affected by the bailiff's silence. Instead, we have noted that this is an additional circumstance that could *potentially* influence the jury, or *possibly* lead them to think differently about the contacts. This is consistent with the analysis we have laid out earlier in this opinion, which requires consideration of additional circumstances in the contact that might weigh either toward or against a presumption of prejudice.

technician's statements further reinforce our application of the presumption in this case.

## III. REBUTTING THE PRESUMPTION OF PREJUDICE

¶86   While this court and the court of appeals have been more or less consistent in applying the presumption of prejudice, we have not consistently articulated a standard for rebutting the presumption.[16] Nor have we suggested how the State might go about doing so. As a result, district courts have taken an ad hoc approach to applying and rebutting the presumption. Typically, the court interviews the jurors, and potentially the individuals who contacted them, and asks things like: "What did you hear?" and "will this affect your decision?" (to which the jurors almost invariably respond, "no"). *Cf., e.g.*, *State v. Erickson*, 749 P.2d 620, 620–21 (Utah 1987); *State v. Pike*, 712 P.2d 277, 279 (Utah 1985); *Logan City v. Carlsen*, 799 P.2d 224, 225 (Utah Ct. App. 1990); *State v. Cardall*, 982 P.2d 79, 82 (Utah 1999). Or the court may request affidavits to the same effect. *See, e.g.*, *State v. Crank*, 142 P.2d 178, 194 (Utah 1943); *State v. Tenney*, 913 P.2d 750, 757 (Utah Ct. App. 1996). Here, the court interviewed the jurors and issued a curative instruction. Accordingly, the State argues, it already bore its burden below to rebut the presumption if the presumption applied in the first instance (which it did).

¶87   Our "strict approach in assuring that the constitutional guarantee of a fair trial not be compromised by improper [jury] contacts," *Pike*, 712 P.2d at 279, becomes less strict when the standard for enforcing that guarantee is lax. We now address this concern and first hold that the State can rebut the presumption by proving that the contact was harmless beyond a reasonable doubt. We applied this standard in the same context well over one hundred years ago, and it is consistent with how we evaluate other constitutional challenges to a defendant's conviction. Second, we suggest how, in the case at bar, the State may prove harmlessness beyond a reasonable doubt—by calling the persons who engaged with the jurors to testify to allow the defendant his confrontation right and/or by showing that the weight of its evidence eliminates

---

[16] Except to say that once the presumption is triggered, the State bears the burden of rebutting it, *see, e.g.*, *State v. Pike*, 712 P.2d 277, 279–80 (Utah 1985), a proposition that the State concedes.

any meaningful prejudice. Finally, we remand to the district court for further proceedings in light of these clarifications.

### A. Rebutting the Presumption Requires Proof Beyond a Reasonable Doubt

¶88   The State may rebut the presumption of prejudice only by showing that the improper jury contact was harmless beyond a reasonable doubt.[17]

¶89   In 1901, this court, relying on authorities from our sister states, pronounced that jury misconduct raises a presumption of prejudice that "vitiates the verdict, unless the prosecution shows *beyond reasonable doubt* that the [defendant] has received no injury by reason thereof." *State v. Morgan*, 64 P. 356, 360 (Utah 1901) (emphasis added). Lamentably, subsequent opinions have not so clearly stated this standard of proof. They do make clear, however, that the burden of proving harmlessness is a heavy one. *See, e.g.*, *State v. Maestas*, 2012 UT 46, ¶ 69 n.56, 299 P.3d 892 ("[T]he burden is on the prosecution to prove that the unauthorized contact did not influence the juror." (quoting *Pike*, 712 P.2d at 280)); *State v. Anderson*, 237 P. 941, 943 (Utah 1925) (requiring a new trial "unless it is made to appear affirmatively that the judgment of the juror was in no way affected by such relationship"); *State v. Thorne*, 117 P. 58, 66 (Utah 1911) (holding that once prejudice is presumed, "the burden [is] cast on the state to show what the communication was, and that it was harmless and could not have influenced or affected the deliberations of the juror or his verdict"). In essence, our holding today—that the State must show that the prejudicial contact was harmless beyond a reasonable doubt—simply makes explicit what was already implicit in our post-*Morgan* jurisprudence.

¶90 The harmless-beyond-a-reasonable-doubt standard is consonant with the approach we take when evaluating other constitutional violations pertaining to a defendant's conviction. As we have explained, "[f]or us to hold a constitutional error harmless, it must be harmless beyond a reasonable doubt. In other words, the side which benefited by the error (the prosecution)

---

[17] At oral argument, both parties suggested that supplemental briefing on the standard of proof might be helpful. Accordingly, we ordered them to provide such supplemental briefing. We appreciate their input.

must show beyond a reasonable doubt that the error did not contribute to the verdict (or sentence) obtained." *State v. Young*, 853 P.2d 327, 359 (Utah 1993) (footnote omitted); *see also Maestas*, 2012 UT 46, ¶ 56 ("[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." (citation omitted) (alteration in original)); *State v. Ross*, 2007 UT 89, ¶ 54, 174 P.3d 628 ("If prosecutorial misconduct is established, the State must show that the error was harmless beyond a reasonable doubt."); *State v. Kell*, 2002 UT 106, ¶ 15, 61 P.3d 1019 ("In most cases, if the reviewing court finds that a constitutional error was harmless beyond a reasonable doubt, it need not reverse.").

¶91 Again, we look to federal jurisprudence interpreting the Sixth Amendment and find it generally consistent with our state standard. As early as 1892, the United States Supreme Court stressed that improper jury contacts "invalidate the verdict, at least unless their harmlessness is made to appear." *Mattox v. United States*, 146 U.S. 140, 150 (1892). In 1954, the Court added that "the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." *Remmer v. United States*, 347 U.S. 227, 229 (1954).[18] Indeed, the general proposition that a constitutional violation must be harmless beyond a reasonable doubt to survive a challenge is deeply rooted in Supreme Court precedent. "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967); *see also Deck v. Missouri*, 544 U.S. 622, 635 (2005).

---

[18] As mentioned above, there is a circuit split in the federal courts regarding the presumption of prejudice. *See supra* ¶ 38 n.8. Among the courts of appeal that follow *Remmer* and apply the presumption, there is a loose consensus that the prosecution bears a heavy burden in rebutting the presumption of prejudice, even if not the precise manner of rebuttal. *See, e.g.*, *United States v. Ronda*, 455 F.3d 1273, 1299 (11th Cir. 2006); *United States v. Rutherford*, 371 F.3d 634, 641 (9th Cir. 2004); *United States v. Cheek*, 94 F.3d 136, 142 (4th Cir. 1996).

¶92 In sum, we hold nothing new by clarifying that the State must prove harmlessness beyond a reasonable doubt to rebut the presumption of prejudice triggered by improper jury contacts.

*B. Proving Harmlessness Beyond a Reasonable Doubt*

¶93 Having determined that the State must prove an unauthorized jury contact was harmless beyond a reasonable doubt, we now address how the State might do that.

¶94 It is not possible or prudent for us to prescribe a clear path to rebutting the presumption of prejudice in every possible case. Whether a court should apply the presumption is a fact-specific inquiry. How the State might rebut it is equally fact-specific, and the State must have flexibility in proving harmlessness.

¶95 But before we offer some suggestions of what might be sufficient to rebut the presumption, we use this case to highlight what is *not* sufficient. The judge's brief questioning of the jurors and their optimistic averments as to their own lack of bias alone are insufficient to rebut the presumption. We have said as much before: "[E]ven if the jurors had denied that they were influenced by the encounter in the post-trial hearing, that is not enough to rebut the presumption of prejudice." *See Pike*, 712 P.2d at 281; *see also Erickson*, 749 P.2d at 621 (citing this holding from *Pike* and concluding that the "same result is mandated in the instant case"). The whole point of applying a *presumption* of prejudice is to mitigate the unconscious bias that commonly results from improper jury contacts. *See, e.g.*, *Pike*, 712 P.2d at 280 (noting "[t]he possibility that improper contacts may influence a juror in ways he or she may not even be able to recognize"); *Anderson*, 237 P. at 943 (mentioning that contact between a juror and a party to the action "might, consciously or unconsciously, tend to influence the judgment of the juror"); *State v. Swain*, 835 P.2d 1009, 1011 (Utah Ct. App. 1992) ("Because of the possible subconscious effect on the juror, the court stated that even a denial by a juror that he or she was affected by the contact is not sufficient to overcome the presumption of prejudice."). If we could simply and reliably ask jurors whether or not they were, in fact, prejudiced, we would never need to presume prejudice. For the same reasons, a curative instruction alone is insufficient to combat potential implicit jury bias once the presumption is triggered.

¶96 Still, all is not lost for the State. In this case, we offer two suggestions of how the State might rebut the presumption. First, the State might call to testify the third parties who communicated with the jury. In this way, the court essentially treats the third-

party communicators as testimonial witnesses whom the defendant can confront and cross-examine. *See* UTAH CONST. art. I, § 12 ("[T]he accused shall have the right . . . to be confronted by the witnesses against [him or her] . . . ."); U.S. CONST. amend. VI ("[T]he accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."). The United States Supreme Court has suggested this approach, explaining that the presumption of prejudice is rooted in a defendant's Sixth Amendment right: "[T]he evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Parker v. Gladden*, 385 U.S. 363, 364 (1966) (per curiam) (quoting *Turner v. Louisiana*, 379 U.S. 466, 472–73 (1965)) (internal quotation marks omitted). And in *Parker*, the Court reversed because the bailiff, "an officer of the State," made sensitive comments to the jury when "he was not subjected to confrontation, cross-examination or other safeguards guaranteed to the petitioner." *Id.*

¶97 As applied here, the district court could have treated the patrolman and IT technician as the State's witnesses—compelling them to submit affidavits or testify to the jury as to the inappropriateness of their comments and their unfitness to say anything regarding the defendant's case. Here, we do not think that the judge's curative instruction was equivalent to allowing Soto to confront those individuals and glean directly from them, in front of the jury, how much they did or did not know about the case. For example, the judge's conclusory instruction that the patrolman "would have absolutely no knowledge of any part of this trial" ignores the patrolman's (and bailiff's) official character as an officer of the State. *See supra* ¶¶ 44–49, 76–77. And the curative instruction downplayed the severity of what was said, simply saying that the patrolman and IT technician "were trying to be funny" by making "off the cuff" remarks. We agree with the court of appeals that this euphemistic instruction "may have done as much harm as good." *State v. Soto*, 2018 UT App 147, ¶ 21, 427 P.3d 1286.

¶98 As a second option, the State might argue that its evidence of the defendant's guilt was so strong that the improper contacts made no difference in the jury's verdict. Ordinarily, when we determine prejudice and its effects, we look, *inter alia*, at the strength of the evidence the State presented:

> [I]n a case with less compelling proof, this Court will more closely scrutinize the conduct. If the conclusion of

34

the jurors is based on their weighing conflicting evidence or evidence susceptible of differing interpretations, there is a greater likelihood that they will be improperly influenced through [the conduct]. Indeed, in such cases, the jurors may be searching for guidance in weighing and interpreting the evidence. They may be especially susceptible to influence, and a small degree of influence may be sufficient to affect the verdict.

*State v. Troy*, 688 P.2d 483, 486 (Utah 1984); *see also State v. Andreason*, 718 P.2d 400, 402–03 (Utah 1986); *State v. Stephens*, 946 P.2d 734, 737 (Utah Ct. App. 1997); *Tenney*, 913 P.2d at 755.

¶99 The federal courts likewise use the strength of the evidence in considering whether a presumption of prejudice was adequately rebutted. *See, e.g., United States v. Lloyd*, 269 F.3d 228, 241 (3d Cir. 2001) ("We have further recognized that a heavy 'volume of incriminating evidence' also can undermine a claim of prejudice." (citation omitted)); *United States v. Rowe*, 906 F.2d 654, 657 (11th Cir. 1990) ("In recognizing the degree of prejudice required and the government's burden to establish harmless error, the strength of the government's case has a bearing on the issue of prejudicial error."); *see also United States v. Honken*, 541 F.3d 1146, 1160–61 (8th Cir. 2008); *United States v. Hornung*, 848 F.2d 1040, 1045–46 (10th Cir. 1988).

¶100 Having explained how the State might go about rebutting the presumption of prejudice in a case like this, we now explain why we remand to allow the State to do so.

### C. We Remand to the District Court to Determine If the State Has Rebutted the Presumption of Prejudice

¶101 In this case's current posture, the question of the evidence's strength is clearly the most plausible path for the State to argue harmlessness beyond a reasonable doubt. Accordingly, the parties made arguments about the strength of the State's case against Soto. However, we think that the district court is better suited to address this matter.

¶102 We acknowledge that the court of appeals found that the State did not rebut the presumption and accordingly reversed Soto's conviction and remanded for a new trial. *Soto*, 2018 UT App 147, ¶ 24. However, in this opinion we have clarified the standard for rebutting the presumption. *Supra* ¶¶ 88–92. And we have explained that whether the State has met its burden of rebuttal is a fact-intensive inquiry, *supra* ¶ 94, best left to the district court

when possible. Accordingly, we find it more prudent to allow the district court to examine the State's arguments in light of this opinion and to determine if the State has successfully rebutted the presumption. Our decision to remand the case for review of the State's strength-of-the-evidence argument should not be seen as approving or disapproving of the court of appeals' reversal, or otherwise opining on the merits of the State's rebuttal of the presumption.

## CONCLUSION

¶103 A uniformed highway patrolman and court IT technician made insensitive comments to the jury regarding Soto's guilt. Because of *who* said *what* to the jury and the *circumstances* of the interaction, Soto was entitled to a rebuttable presumption of prejudice. The State now bears the burden of showing that the interaction was harmless beyond a reasonable doubt. We remand this matter back to the district court to determine whether the presumption of prejudice has been so rebutted. If the district court finds that the State did not rebut the presumption of prejudice beyond a reasonable doubt, Soto must be given a new trial.

---

JUSTICE PETERSEN, dissenting:

¶104 During a lunch recess in Anthony Soto's trial, as the jurors rode in an elevator with a bailiff, both a state trooper and a court IT technician who were not involved in the trial (and knew nothing about Soto's case) made comments to the jurors along the lines of, "Just say he's guilty." The question before us is whether we should presume that the incident in the elevator prejudiced Soto. In practical terms, this would mean that with respect to Soto's motion for a mistrial, he would not bear the burden of proving prejudice—in other words, he would not have to prove that hearing the comments in the elevator had tainted the jurors' impartiality. Rather, the district court would presume that the comments had biased the jurors against Soto, and the burden would shift to the State to rebut that presumption and show the incident was harmless. If the State were unable to meet this burden, Soto would be entitled to a mistrial.

¶105 The majority concludes that our precedent has already answered the question before us, and that it requires a presumption of prejudice in this situation. The majority directs district courts to use a "balancing test" approach to assess whether an incident of improper jury contact triggers a presumption of prejudice. Specifically, the majority instructs courts to analyze whether a presumption of prejudice applies by considering who made the contact, what was said, and the circumstances of the contact to determine whether the communication was likely to influence a juror's judgment.

¶106 I fully agree with the majority that a criminal defendant's constitutional right to a trial by an impartial jury is sacrosanct. But I disagree with the majority on two points.

¶107 First, I would not adopt the balancing test established by the majority. If we are to apply a presumption of prejudice to certain unauthorized juror communications, the test for whether the presumption applies should be tethered to our existing rules defining impermissible communication with jurors. Instead, the majority's balancing test conflates distinct principles established in our precedent to arrive at an abstract balancing test that seems to forget the work we have already done in this area.

¶108 Second, even applying the majority's holding that we must presume prejudice here, I would reverse the court of appeals' decision because the district court substantially analyzed this incident under such a standard. The district court took the report of impermissible contact with the jury seriously; it immediately

37

interviewed each juror, with the parties present, to determine what had happened; it considered defense counsel's motion for a mistrial; and it ultimately found that the incident in the elevator did not taint the jurors' impartiality—in other words, that the contact was harmless. The court did not deny Soto's mistrial motion because it found he had not demonstrated prejudice. Rather, it made a factual determination that the jurors had not been tainted by the comments. Further, the court instructed the jury that the state trooper and the IT technician had no information about Soto's case and the jury must not consider anything that the two men had said to them. As our precedent requires, I would defer to the district court's factual findings, and I would presume that the jurors obeyed the instruction they were given. So I must respectfully dissent.

## ANALYSIS

## I. THE BALANCING TEST

¶109 I would not adopt the "balancing test" established by the majority. It is unnecessarily generalized and novel, and it distorts our existing precedent. Our precedent and procedural rules have already established principles for identifying impermissible off-the-record communication with jurors. In other words, we have already considered the "who," the "what," and the "under what circumstances" and have established the following rules identifying the type of outside contact that can unduly influence jurors:

> First, jurors may not have off-the-record communications with trial participants, even about innocuous topics that are not related to the trial (rule 1).

> Second, during trial, jurors may not have off-the-record communications with any person about a subject of the trial (rule 2).

> And third, during deliberations, the jury must not separate, and, except for some narrow exceptions, jurors may not have communications with anyone outside of the deliberation room (rule 3).[19]

---

[19] I do not contend that these are the only rules aimed at protecting juror impartiality. There may be others that are not directly implicated by the analysis in this case.

JUSTICE PETERSEN, dissenting

¶110 There is no need to redo this calculus on a case-by-case basis. To be clear, I am not saying that these rules answer in and of themselves whether their violation triggers a presumption that the defendant has been prejudiced. In other words, I do not contend that these rules answer the specific question before us—whether the circumstances here trigger a presumption of prejudice. Rather, my point is that these are the foundational rules we have established to identify which communications threaten juror impartiality. They serve as guides to district courts in their efforts to protect jurors from outside influence during trial. And we should analyze whether the communication here should trigger a presumption of prejudice using this existing framework.

¶111 I will discuss each of the three rules in more depth, and I will demonstrate that up to this point, these principles have guided our analysis regarding the application of a presumption of prejudice. Specifically, this court has concluded that violations of rules 1 and 3 trigger a presumption of prejudice. But we have not addressed whether the presumption holds when rule 2, which forbids jurors from communicating with anyone outside the trial about a subject of the trial, is violated.[20]

¶112 Importantly, this case presents a violation of rule 2. So this is our opportunity to analyze whether we should extend the presumption of prejudice to cover violations of this rule, as well. Instead, the majority insists we have already answered this question using a framework of "who," "what," and "under what circumstances." This is an unnecessary departure from our existing principles.

### A. Rule 1: Jurors and Trial Participants Must Not Communicate Outside of the Trial

¶113 First, jurors may not have off-the-record communications with *trial participants* about anything, even about topics that have nothing to do with the trial. As our civil rules make clear, "[t]here shall be no off-the-record communication between jurors and *lawyers, parties, witnesses or persons acting on their behalf.*" UTAH R. CIV. P. 47(*l*) (emphasis added). Thus, jurors are precluded from communicating and socializing outside of the trial with trial

---

[20] Of course, our precedent has not referenced these principles as rules 1, 2, and 3. I employ these labels here only for ease of reference within this opinion.

participants—people with an interest in the outcome of the trial or whose credibility the jury may be called upon to assess. This rule's mandate of "no . . . communication" prohibits even innocuous communication that is not substantive or case-related—like small talk about the weather simply to pass the time. A brief and incidental "excuse me" in the hallway, or a "gesundheit" after a sneeze, would not offend this rule. But we do not want jurors and witnesses, the parties, or their lawyers to say much more than that to one another off the record. And as discussed below, we have applied a presumption of prejudice when this rule is violated.

¶114 There are two primary reasons for this rule. First, "[a]nything more than the most incidental contact during the trial between witnesses and jurors casts doubt upon the impartiality of the jury and at best gives the appearance of the absence of impartiality." *State v. Pike*, 712 P.2d 277, 279–80 (Utah 1985). And second, we are concerned that socializing between jurors and trial participants will lead to "[p]ositive or negative impressions, humorous feelings, expectations, or any such unintended and unseen psychological coercion [that] may spring from such interactions," *supra* ¶ 36, which may "exert influence upon the deliberations of a juror, 'consciously or unconsciously,'" *supra* ¶ 36 (quoting *State v. Anderson*, 237 P. 941, 943 (Utah 1925)).

¶115  Two cases explain these rationales in depth.

1. *State v. Anderson*

¶116 In *State v. Anderson*, at the close of a two-week trial, it came to light that a "juror had frequently, in fact almost daily, ridden back and forth from his home to the courthouse with one of the prosecuting witnesses . . . ." 237 P. 941, 942. That "prosecuting witness" was not formally a party to the case but was an "interested party"—"one of the owners of the sheep which the appellant [wa]s charged with having stolen," *id.* at 944, and an "active" participant in the State's case, *id.* at 943. The trial court was "satisfied that there was no intention on the part of [the interested party and witness] to influence the verdict of the juror, and that the act of carrying the juror to and from his home was one of generosity and courtesy only." *Id.* at 942.

¶117 But this court held that the arrangement violated the defendant's right to an impartial jury, even assuming that the interested party had not attempted to influence the juror. *Id.* at 943. We explained that

> the law requires of the juror such conduct during
> that time that his verdict may be above suspicion as

to its having been influenced by any conduct on his part during the trial, or by any courtesy or favor received by him from *any one in any way directly or indirectly interested in the result of the litigation*.

*Id.* at 944 (emphasis added). Accordingly, we held that in the event of "any conduct or relationship between a juror and *a party to an action* during trial that would or might, consciously or unconsciously, tend to influence the judgment of the juror," a new trial was required "unless it is made to appear affirmatively that the judgment of the juror was in no way affected by such relationship . . . ." *Id.* at 943 (emphasis added).

2. *State v. Pike*

¶118 We further explained the rationale for prohibiting out-of-court contact between jurors and trial participants in *State v. Pike*. In that case, the defendant, Pike, was charged with aggravated assault. 712 P.2d 277, 278. Pike had tried to clear three party crashers from a party in his neighborhood. *Id.* Several police officers, including one Officer Fleming, arrived at the scene and told the party crashers to leave. *Id.* at 278–79. Pike demanded that Officer Fleming arrest the men and said he would "take care of the intruders if the officers did not." *Id.* at 279. Officer Fleming drove off. *Id.* Allegedly, the party crashers taunted Pike, who responded by firing a shotgun at their vehicle. *Id.* Officer Fleming returned and arrested Pike. *Id.*

¶119 Officer Fleming testified at trial. *Id.* at 279. During a recess, he came into contact with some jurors. *Id.* The judge learned of the interaction and questioned Fleming:

> [A]fter the court had taken a short recess, the trial judge questioned Officer Fleming in chambers as to whether he had spoken to any jurors during the recess. Officer Fleming admitted that a juror had asked him why he was limping. Fleming replied: "I told him I had bunged my toe. . . . And he asked me how I did that. And I told him about slipping in my back yard on the water and breaking—" At this point, the judge interrupted Fleming's narrative of the conversation. The judge and counsel agreed to let the incident go until after the verdict was in and then to question the jurors involved in the conversation. After the trial, the judge questioned the jurors involved and apparently determined that the conversation was innocuous.

*Id.* (second alteration in original).

¶120 On appeal, we considered whether "the constitutional guarantee of a fair trial" had been compromised. *Id.* We concluded that "[a]nything more than the most incidental contact during the trial between witnesses and jurors casts doubt upon the impartiality of the jury and at best gives the appearance of the absence of impartiality." *Id.* at 279–80. We noted that, following contact between jurors and trial participants, "prejudice may well exist even though it is not provable," due to the "inherent difficulty in proving how or whether a juror has in fact been influenced by conversing with a participant in the trial." *Id.* at 280. So we declared that "[t]he rule in this jurisdiction is that improper juror contact with witnesses or parties raises a rebuttable presumption of prejudice." *Id.* We explained that this presumption applied only to "contacts between jurors and others involved in a trial that are more than brief and inadvertent encounters." *Id.* And we "reaffirm[ed] the proposition that a rebuttable presumption of prejudice arises from any unauthorized contact during a trial between witnesses, attorneys or court personnel and jurors which goes beyond a mere incidental, unintended, and brief contact." *Id.* Because Officer Fleming was "an important prosecution witness, who was both the arresting officer and a witness at the scene of the altercation," we presumed that the interaction "no doubt had the effect of breeding a sense of familiarity that could clearly affect the jurors [sic] judgment as to credibility." *Id.* at 280.

¶121 In essence, the rationale underlying rule 1 and the cases that expound upon the principle it codifies, such as *Anderson* and *Pike*, is that even innocent small talk between jurors and trial participants is problematic because it creates an appearance of impropriety and breeds familiarity that could subtly influence a juror to favor one side or the other. These cases highlight the danger of any contact between trial participants and jurors that is more than "inadvertent," "incidental," "unintended," and "brief." *Pike*, 712 P.2d at 280.

## B. Rule 2: Jurors May Not Have Off-the-Record Communications with Any Person About a Subject of the Trial

¶122 The next foundational rule is that jurors may not have off-the-record communications with any person about a subject of the trial. This rule is codified in our rules of procedure. UTAH R. CIV. P. 47(*l*) ("Jurors shall not communicate with any person regarding a subject of the trial."). And the civil rules make clear that the converse is also true: "Jurors may communicate with court

personnel and among themselves about topics other than a subject of the trial." *Id.* Further, the criminal rules require trial courts to admonish jurors "[a]t each recess of the court" that "it is their duty not to converse among themselves or to converse with, or suffer themselves to be addressed by, any other person on any subject of the trial . . . ." UTAH R. CRIM. P. 17(j).

¶123 Unlike rule 1, which applies only to communication between jurors and trial participants, this rule applies to off-the-record communication between jurors and any other person. This is a sensible rule. Jurors are simply not allowed to discuss the trial with anyone outside of the courtroom, even other jurors.

¶124 Rule 2 is the principle that is implicated in this case. The reason that the comments of the state trooper and the IT technician were problematic is that, while the two men did not actually know anything about the case, their suggestions to "just say he's guilty" touched upon a subject of the trial—the ultimate determination of whether the defendant should be convicted.

¶125 We have not previously addressed whether a presumption of prejudice should be triggered by a violation of this rule. Indeed, that is the question before us today.

*C. Rule 3: During Deliberations, the Jury May Not Separate or Communicate with Anyone*

¶126 The final foundational rule is that, during deliberations, jurors must remain together, and except for some narrow exceptions, may not communicate with anyone outside of the deliberation room. As with the other two rules, this rule is codified in our rules of procedure. The criminal rules state:

> When the case is finally submitted to the jury, they shall be kept together in some convenient place under charge of an officer until they agree upon a verdict or are discharged, unless otherwise ordered by the court. Except by order of the court, the officer having them under the officer's charge shall not allow any communication to be made to them, nor shall the officer speak to the jury except to ask them if they have agreed upon their verdict, and the officer shall not, before the verdict is rendered, communicate to any person the state of their deliberations or the verdict agreed upon.

UTAH R. CRIM. P. 17(*l*).

¶127 And it is codified in our civil rules:

> When the case is finally submitted to the jury they may decide in court or retire for deliberation. If they retire they must be kept together in some convenient place under charge of an officer until they agree upon a verdict or are discharged, *unless* otherwise ordered by the court. Unless by order of the court, the officer having charge of them must not make or allow to be made any communication to them with respect to the action, except to ask them if they have agreed upon their verdict, and the officer must not, before the verdict is rendered, communicate to any person the state of deliberations or the verdict agreed upon.

UTAH R. CIV. P. 47(m) (emphasis added).

¶128 This court discussed this principle in *State v. Thorne*, 117 P. 58 (Utah 1911), and held that jury conduct in contravention of the rule must result in a presumption of prejudice.

1. *State v. Thorne*

¶129 The defendant in *Thorne* asserted that a new trial was necessary "on the ground of the separation of the jury and the misconduct of one of its members" following the submission of the case. *Id.* at 66. During lunch, in violation of the requirement that a deliberating jury not separate,[21] "one of the jurors with one of the officers went into another part of the building where the juror talked to some one over the telephone." *Id.* This court concluded that "prejudice [wa]s presumed" and assigned to the State the burden of showing that the communication was "harmless." *Id.* But because the State failed to show "what the conversation over the telephone was, or with whom it was held, or that it was harmless, and could not have influenced or affected the

---

[21] When *Thorne* was decided, juries were subject during deliberations to a procedural rule very similar to our current criminal rule 17(*l*). *See* COMPILED LAWS OF UTAH § 9007 (1907) ("After hearing the charge, the jury may either decide in court or may retire for deliberation. If they do not agree without retiring an officer must be sworn to keep them together in some private and convenient place and not permit any person to speak to or communicate with them, nor to do so himself, unless by order of the court . . . .").

JUSTICE PETERSEN, dissenting

deliberations of the juror or his verdict," the verdict was overturned. *Id.*

### D. The Majority's Interpretation of Our Precedent

¶130 But in spite of this well settled and widely understood framework, the majority develops a new balancing test to determine whether a particular instance of unauthorized jury contact triggers a presumption of prejudice. In light of the rules outlined above, we do not need a new test. Any analysis for determining if the presumption applies should be based upon the rules we already have in place. We should follow the lines we have already drawn, not blur them.

¶131 We have applied a presumption of prejudice when the rule against off-the-record communication between jurors and trial participants has been violated (rule 1). *See, e.g., Pike*, 712 P.2d at 280; *Anderson*, 237 at 943; UTAH R. CIV. P. 47(*l*). And we have applied a presumption of prejudice when a juror violated the strict rules governing jury deliberations (rule 3). *See, e.g., Thorne*, 117 at 66–67; UTAH R. CRIM. P. 17(*l*); UTAH R. CIV. P. 47(m). But we have not addressed whether this presumption should apply to a violation of rule 2, which is implicated by the facts here. The question before us today is whether to extend our caselaw regarding a presumption of prejudice to a violation of this rule. We do not need a novel balancing test to answer that question.

¶132 Further, the majority's insistence that our precedent has already decided this question overrides the particular rationales of key precedent regarding jury impartiality.

¶133 For example, the majority interprets *Pike* to apply beyond trial participants to juror conversations with anyone who can be considered "court personnel," such as court employees like the IT technician in this case. *Supra* ¶¶ 34, 49–50. This is because the term "court personnel" appears twice in that case. *Pike*, 712 P.2d at 279 ("We have long taken a strict approach in assuring that the constitutional guarantee of a fair trial not be compromised by improper contacts between jurors and witnesses, attorneys, or *court personnel*."(emphasis added)); *id.* at 280 (stating that we were "reaffirm[ing] the proposition that a rebuttable presumption of prejudice arises from any unauthorized contact during a trial between witnesses, attorneys or *court personnel* and jurors."(emphasis added)). The majority focuses on court personnel who "represent . . . the authority of the criminal justice system," as more likely to influence a juror under its "who" analysis. *Supra* ¶ 50.

¶134 But *Pike* does not speak to communication between jurors and people uninvolved in the trial. In context, it is clear that "court personnel" is used as a synonym for court participants or *courtroom* personnel. In both instances in which "court personnel" is used, the term is part of an exemplary list alongside *participants in a trial*, such as witnesses and attorneys. *See Pike*, 712 P.2d at 279 (discussing "improper contacts between jurors and *witnesses, attorneys, or court personnel*.") (emphasis added); *id.* at 280 ("reaffirm[ing] the proposition that a rebuttable presumption of prejudice arises from any unauthorized contact during a trial between *witnesses, attorneys or court personnel* and jurors" (emphasis added)).[22]

¶135 Further, the rationale of *Pike* does not hold beyond the confines of trial participants. To confirm this point, all one must do is transpose the communication that was found to be problematic in *Pike* to a communication between a juror and someone the majority would deem to fall within the category of court personnel with authority in the criminal justice system, like a judge. In this transposed scenario, during a court recess a juror notices a judge walking down an interior hallway favoring one leg. The jurors asks the judge if she is alright. And the judge answers that she "bunged [her] toe. . . . slipping in [her] back yard . . . ." *Pike*, 712 P.2d at 279.

---

[22] Indeed, when the *Pike* court used the term "court personnel," it cited to cases in which jurors had contact with participants in the trial, not disinterested third parties who happen to work at the courthouse. *See State v. Pike*, 712 P.2d 277, 279 (Utah 1985) (citing *State v. Crank*, 142 P.2d 178, 194 (Utah 1943), and declining to determine whether juror who spoke with a witness "in a friendly fashion" before the case was submitted to the jury warranted reversal because the court remanded for a new trial on different grounds); *Glazier v. Cram*, 267 P. 188, 190–91 (Utah 1928) (noting juror "[m]ingling intimately in social contact with prominent witnesses upon whose testimony the case [was] determined is not to be commended" but declining to reverse the verdict because the parties knew about the contact but did not bring it to the trial court's attention); *State v. Anderson*, 237 P. 941, 944 (Utah 1925) (remanding for a new trial after juror rode to and from the courthouse with prosecuting witness almost every day for the three-week trial)).

¶136 Clearly, the same communication about an injured foot that jeopardized the juror's impartiality in *Pike* because it took place with a trial witness would pose no risk to the juror's impartiality if it took place with a judge. This conversation would not "cast[] doubt upon the impartiality" of the juror. *See Id.* at 279. And even if the juror felt sympathy or positive feelings toward the judge, it would not matter because these feelings would not influence the juror to favor one of the parties in the trial.[23] In fact, our civil rules explicitly permit communication between jurors and "court personnel" as long as they do not discuss a subject of the trial. *See* UTAH R. CIV. P. 47(*l*). So the rationale of *Pike* simply does not fit outside the context of communications between jurors and trial participants. To stretch *Pike* beyond this context distorts its important analysis.

¶137 The same is true of the majority's reliance on *Thorne* for the broad proposition that "[o]nce an improper jury contact is shown, 'prejudice is presumed.'" *Supra* ¶ 32 (quoting *Thorne*, 117 P. at 66). I agree in general that *Thorne* shows this court has long taken juror impartiality very seriously. But as discussed above, that case involves the unique setting of jury deliberations and apparent juror misconduct. *Supra* ¶ 68. It does not tell us whether the presumption of prejudice this court applied there should be extended to this setting, where outsiders to the trial make comments to the jury about a subject of the trial outside the context of deliberations.

¶138 To be clear, I agree with the majority that the statements here are impermissible and must be taken seriously. They are a violation of rule 2. And I agree that the comments are made even

---

[23] We have previously made this very point. In a capital case, the judge dismissed the jury early in an off-the-record exchange, because some of the jurors had indicated they had "appointments." *State v. Maestas*, 2012 UT 46, ¶ 67, 299 P.3d 892. The defendant argued that the *ex parte* communication between the judge and jury should be presumed to have prejudiced him because it could have caused the jury to feel "a greater warmth and affinity toward the judge." *Id.* ¶¶ 68-71. We rejected this argument as inapplicable, stating that, "as the judge was not an adversary to Mr. Maestas in the proceedings, it would not have been problematic if jurors felt appreciative toward the judge after being dismissed." *Id.* ¶ 71.

worse by the fact that they came from an officer of the law and a court employee. But those facts are relevant to the final analysis of whether the incident prejudiced the defendant. The question we must answer here is what standard we should apply when conducting that analysis and who bears the burden of proof.[24] And my point is that our prior cases have not addressed whether the presumption of prejudice that we have applied upon a violation of other rules protecting jury impartiality should apply to a violation of the rule against communication between jurors and "any person" about a subject of the case.

¶139 Other courts have addressed this question when interpreting the United States Constitution's Sixth Amendment or other similar state constitutional amendments. Those courts' holdings have been inconsistent with regard to the presumption of prejudice.

¶140 The United States Supreme Court originally declared a presumption of prejudice existed whenever someone communicated with a juror about the trial. *See Remmer v. United States*, 347 U.S. 227 (1954) (*Remmer I*); *Remmer v. United States*, 350 U.S. 377 (1956) (*Remmer II*). In *Remmer I*, a man had offered to pay the jury foreman to secure a not guilty verdict—an offer that the judge ultimately determined was a (bad) joke that did not prejudice the case. *See Remmer I*, 347 U.S. at 229. On review, however, the Court held that "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury" was "presumptively prejudicial" under the Sixth Amendment. *Id.*

¶141 But subsequent cases called that holding into question. In *Smith v. Phillips*, the Court said that "[t]his Court has long held that the remedy for allegations of juror partiality is a hearing in which

---

[24] The majority argues that we have repeatedly assessed juror contacts with judges or bailiffs under a more heightened standard. *Supra* ¶¶ 45, 82. But the majority cites no case where we have applied a presumption of prejudice when a judge or bailiff communicates outside of court with a juror just because of "who" they are. Rather, the cases cited by the majority show that a communication between a judge or bailiff and a juror is not problematic unless they violate an existing rule by, for example, making a comment about a subject of the trial. *See supra* ¶ 82.

JUSTICE PETERSEN, dissenting

the defendant has the opportunity to prove actual bias." 455 U.S. 209, 215 (1982). It characterized the *Remmer* cases as describing bribes as "presumptively prejudicial" and instructing "trial judge[s] to determine the circumstances, the impact thereof upon the juror, and whether or not [they were] prejudicial." *Id.* at 216 (second alteration in original) (citation omitted) (internal quotation marks omitted). And *Smith* noted that pre-*Remmer* Supreme Court cases had required parties "to show the existence of actual bias" in order to disqualify jurors. *Id.* at 216 (quoting *Dennis v. United States*, 339 U.S. 162, 167 (1950)).

¶142 And the Supreme Court was again dismissive of the presumption of prejudice in *United States v. Olano*, 507 U.S. 725 (1993). In *Olano*, the trial judge allowed alternate jurors to attend jury deliberations. *Id.* at 729–30. While that violated the proper procedural practice, the Court determined that the defendants failed to "ma[k]e a specific showing of prejudice" and that there was "no reason to presume prejudice here." *Id.* at 737. *Olano*, like *Smith* (to which *Olano* cited heavily), characterized the *Remmer* cases as an instance where extreme conduct triggered a presumption of prejudice. *Id.* at 738. So the Court said that "[t]here may be cases where an intrusion should be presumed prejudicial." *Id.* at 739. But the Court did not apply a presumption of prejudice merely because the jurors discussed the case with a disinterested party (in that case, an alternate juror). It simply noted that the error was not "inherently prejudicial" and not, at least in this instance, actually prejudicial. *Id.* at 740 (citation omitted)(internal quotation marks omitted).

¶143 Here, we could decide that since we have applied a presumption of prejudice to violations of the other two jury impartiality rules, we should apply it to a violation of this rule as well. But the risks to juror impartiality posed by the conduct here are different than the risks caused by fraternization between jurors and trial participants or a juror separating during deliberations. It may be that the circumstances here warrant a presumption of prejudice as well. But the majority has not explained why, because it has focused its energies on arguing that we have already answered this question.

## II. THE DISTRICT COURT SATISFIED THE MAJORITY'S STANDARD

¶144 Ultimately, however, I do not find the presumption of prejudice to control the outcome here. This is because the district court's handling of this matter essentially satisfied that standard.

The court did what the U.S. Supreme Court required in *Remmer I*: it "determine[d] the circumstances, the impact thereof upon the juror[s], and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Remmer v. United States*, 347 U.S. 227, 230 (1954). Upon learning of the interaction in the elevator, the court interviewed each juror individually in the presence of the parties and counsel to determine what the juror had heard and whether those comments would affect the juror in any way.

¶145 Based on the jurors' answers, the court then made the following findings on the record: that the jurors found the comments to have been made in a "kind of a joking off-the-cuff manner"; none of the jurors took the comments seriously; no juror indicated that they felt either the deputy or the IT technician "had any knowledge of this trial"; and when asked if the comments would affect their decision-making, "there was not even a person that hedged when they answered the question. They were all with absolute certainty that . . . this would have absolutely no [e]ffect on them."

¶146 When the jury returned, the court gave them a curative instruction informing them that the state trooper and the IT technician knew nothing about the trial, and reminding the jury that their verdict must be based only on the evidence at trial.

¶147 In denying Soto's motion for a mistrial, the court did not place the burden of proof on Soto and ground its decision in a failure to prove prejudice. Rather, the court assumed the communication could have caused prejudice and denied the motion only after assuring itself that the comments had not tainted the jury and were therefore harmless.

¶148 The court of appeals and the majority brush aside the jurors' assurances that they were not impacted by the comments, the district court's factual findings, and the court's curative instruction. *Supra* ¶ 95. This disregards our general practice of deferring to a district court's factual findings[25], *see State v. Perea*,

_____

[25] Along these lines, I disagree with the majority's conclusion that the bailiff's silence in the elevator may have aggravated the improper contact here, because the jurors could have perceived the bailiff to be tacitly endorsing the comments. *Supra* ¶¶ 81–83. There are few record facts about the bailiff's conduct in the elevator. We

(continued . . .)

JUSTICE PETERSEN, dissenting

2013 UT 68, ¶ 32, 322 P.3d 624, and presuming that jurors follow instructions, *State v. Harmon*, 956 P.2d 262, 272–73 (Utah 1998). Further, our concern in *Pike* and *Anderson* that jurors may not be aware of the bias that can result from over-familiarity with trial participants does not automatically apply to every situation in which jurors are asked how a particular interaction has affected them. *See State v. Pike*, 712 P.2d 277, 280 (Utah 1985); *State v. Anderson*, 237 P. 941, 943 (Utah 1925). It is not obvious that the jurors here would be unable to judge whether the comments in the elevator had biased them. And the district court, who observed the jurors as they answered its questions, found that the jurors disregarded the comments. I see no basis for overriding these findings.

## CONCLUSION

¶149 We do not need to reinvent our rules governing communications with jurors. The rules found in our caselaw and codified in our procedural rules are clear and we should apply them with consistency. While we have applied a presumption of prejudice to violations of two of the rules protecting juror impartiality and jury deliberations, we have not addressed whether to apply it in the event of unauthorized communications between jurors and "any person" about a "subject of the trial." Arguing that our precedent already answers this question, the majority does not explain why we should extend the presumption to the circumstances here. In any event, I conclude that the district court substantially applied a presumption of prejudice here and dismissed Soto's motion for a mistrial only after assuring itself that the comments to the jury were harmless. Accordingly, I would reverse the court of appeals. Or, at most, I would remand to the district court to allow that court to determine if its decision would remain the same under the majority's newly announced beyond-a-reasonable-doubt standard.

---

know that the bailiff recognized that the comments were problematic and immediately reported the incident to the court after the lunch recess so the court and parties could determine how to handle it. I see no record support for speculation that the bailiff's behavior may have conveyed to the jurors that he approved of the comments. Most importantly, the trial court made no factual findings that the bailiff's handling of the situation influenced the jurors in any way.